# Court of Appeals.

## June, 1888.

## PEOPLE v. CIGNARALE.

MURDER.—APPEAL TO COURT OF APPEALS.—L. 1887, CH. 493.—FORMER ACQUITTAL.—WITHDRAWAL OF PLEA OF GUILTY OF MINOR DEGREE OF CRIME.

It was the intention of the legislature by Laws of 1887, chapter 493, —giving to the Court of Appeals in capital criminal cases the power to grant a new trial where the verdict was against the weight of evidence, or where justice requires a new trial,—to invest the Court of Appeals with the jurisdiction formerly possessed by the Supreme Court to grant new trials on the merits in criminal cases. In such cases the Court of Appeals must be able, upon a review of the proceedings, to reach the conclusion that injustice has been done on the trial, before it is justified in setting aside the verdict.

The fact that there was on the trial a conflict of evidence is not alone a ground for granting a new trial by that court.

The defense of former acquittal must be pleaded, and in the absence of such plea the question cannot be raised. But in a capital case the Court of Appeals, under Laws of 1887, chapter 493, will take notice of the fact of a former acquittal, although not presented by a formal plea.

The fact that on a former trial defendant, indicted for murder, pleaded guilty to murder in the second degree, and after the acceptance of that plea withdrew it and pleaded not guilty, is not a bar to a conviction upon a subsequent trial, under the same indictment, of murder in the first degree.

The withdrawal of a plea of guilty of a certain degree of crime leaves the case without any plea at all until another is interposed, and the defendant can take no benefit from the possible effect of such withdrawn plea as an acquittal of a higher degree of the crime.

The waiver wrought by the withdrawal of a plea involves the waiver of all that depends upon that plea.

Appeal by the defendant, Chiara Cignarale, from a conviction at the Court of General Sessions of the city and county of New York, on May 27, 1887, of the crime of murder in the first degree, under an indictment found against her and one Antonio D'Andrea, jointly charging them with the murder of one Antonio Cignarale on October 20, 1886. The appeal is brought directly to this court from the judgment of the Court of General Sessions, under chapter 493 of the act of 1887.

Antonio Cignarale was the defendant's husband. They were both natives of Italy. There they had been married in their very early youth, and had lived as man and wife for about thirteen years, when in March, 1886, they came to America and settled in the city of New York. The defendant at that time was about twenty-four years of age. They brought with them a daughter about eight years of age, the only child of the marriage. They were both extremely poor, and, besides being strangers to the language, customs and habits of the people they had come to live among, they had but little acquaintance among those who form the Italian colony in New York. Among the number of those whom they had, however, known at their native home was the defendant, Antonio D'Andrea, a young man who, it seems, was second cousin to the appellant. Through him the husband procured work at his trade as a mason on the first day of his arrival in New York. He soon abandoned this employment, claiming the work was too hard, and went to blacking boots, and, as the defendant testified, insisted upon her aiding him in that business, and when she declined to do this he then insisted that she should pick up rags in the streets, which she also refused to do, but told him she would wash or do other work suitable for a woman. The evidence justifies the conclusion that the husband was a lazy, shiftless person, unwilling to follow his trade for the support of his family. On reaching New York they took up their abode and lived in a very

humble way on the top floor of No. 342 East One Hundred and Tenth street in that city, and they continued to live together there for two or three months until about July 1, 1886. The husband, according to the evidence, treated his wife in a very brutal manner, beating and kicking her, spitting in her face, and generally treating her with great indignity.

The husband was jealous of D'Andrea and accused his wife with having improper relations with him. About July 1, 1886, the defendant left her husband and took rooms in Forsyth street, leaving her daughter with the deceased. The defendant testified that she was driven away by her husband, and that when she left him she intended to return to her friends in Italy. She had $100 when she left Italy, of which $30 remained. With this she says she intended to pay her passage home, and there obtain money from her friends to send for her child. When she left her husband she took with her a pistol and a box of cartridges, which she testifies her husband had bought with her money. On leaving her husband, she sought D'Andrea to assist her to obtain a passage ticket to Italy. But she abandoned her purpose, finding that she was very ill and weak, and, at D'Andrea's suggestion, took rooms in Forsyth street. D'Andrea came to board with her then, as did also two or more other Italians. The defendant remained in Forsyth street until a few days before the homicide, when she removed to One Hundred and Twenty-fifth street, D'Andrea and the other boarders going with her.

The people sought on the trial to establish that improper relations existed between the defendant and D'Andrea. There was direct evidence to support this view given by one De Mora Marro and one Filomena Nardiele, a married woman who had left her husband to live with De Mora Marro, and who, as they testified, occupied rooms in Forsyth street, during a part of the time the defendant resided there. They also testified that while residing in Forsyth street they heard the defendant threaten the life of her

husband, and also heard D'Andrea promise the defendant to marry her if her husband was out of the way, and also heard him giving her instructions in the use of the pistol, using for that purpose a pistol of his own. The defendant denied that she lived in adultery with D'Andrea and testified that she had for several years been afflicted with a disease of the womb which rendered sexual intercourse on her part with any one impossible. In support of this statement the declarations of the husband were permitted to be given in evidence. The defendant also denied the statement of De Mora Marro and the woman Nardiele as to the alleged threats and the promise of D'Andrea to marry her, and as to the instructions in the use of a pistol.

It was claimed by the defendant that their evidence was instigated by malice because she refused to permit them to stay in the house or to harbor therein. It may fairly be said that their evidence is in some respects open to suspicion from its intrinsic impossibility. But taking the evidence of all the witnesses together, the jury would have been justified in finding that adulterous relations existed between the defendant and D'Andrea.

After the defendant left the house of her husband on One Hundred and Tenth street, he removed to One Hundred and Seventh street, and there continued to live to the time of his death. The daughter was taken to a convent. The defendant testified that the husband frequently came to her rooms in Forsyth street and tried to get in, but she locked the door and kept him out, and he would go away threatening her life.

The narration thus far relates to facts preceding the day of the homicide, which occurred at about 12 o'clock on the morning of October 20, 1886.

The theory of the prosecution was that the killing was a deliberate and premeditated assassination.

On the other hand it was claimed by the defendant that the killing was in self-defense and therefore justifiable, or if not justifiable so as to completely exonerate the defendant

from liability, that there was an absence of the elements of deliberation and premeditation essential to the crime of murder in the first degree.

It is conceded that the deceased was killed by a pistol shot fired by the defendant on First avenue between One Hundred and Tenth and One Hundred and Eleventh streets in the City of New York. The only eye-witnesses of the occurrence other than the defendant, were Dominico Stabile, a carpenter, Vincenza Allistalo, a midwife, and one Pasquale Rosa, a grocer. These persons were strangers to Cignarale and his wife, and, so far as appears, were wholly disinterested witnesses. The witness Stabile testified in substance that at about 11.45 o'clock on the morning in question he was on the east side of First avenue, going from One Hundred and Tenth to One Hundred and Thirteenth street, and found the deceased on the same side of the avenue, who was walking leisurely in the same direction, with his hands in his pockets and whistling. In passing he observed a woman following the deceased at a distance of about ten feet behind him. The woman was the defendant.

Suddenly, when only a few feet in advance of the deceased, the witness was startled by the report of a pistol, and turning, saw the woman with a smoking revolver in her hand and cocking it for another shot. He at once called out to the deceased, saying to him, " Run away, or you will be shot." The deceased thereupon turned partly around, and the woman at the same moment fired again. The deceased, wounded and frightened, exclaimed, " Holy Virgin, Holy Virgin," and commenced to run away from the woman, until at the corner of the avenue and One Hundred and Twelfth street, he fell and in a few moments died. The woman, after firing the second shot, cocked the revolver again and proceeded to the place where her husband was lying and, as the witness states, " was going around the crowd with the revolver, and looking between the legs of the crowd with the revolver." The defendant then passed

up One Hundred and Twelfth street to Second avenue, and was arrested between One Hundred and Thirteenth and One Hundred and Fourteenth streets by an officer, having the cocked revolver in her pocket.

The officer testified that when he first saw the defendant on Second avenue she had the revolver in her hand, and when she saw him she put it in her pocket, and that after arresting her he took her to the corner of One Hundred and Twelfth street, where the deceased was lying, and on seeing him she made a motion as if to snatch the revolver from the officer, who then had it in his hand.

The witness Allistalo, who at the time was walking up the west side of the avenue and witnessed the occurrence, corroborated the statement of the witness Stabile in all material respects. She testified that the deceased was about ten feet in advance of the defendant, walking "indifferently." She said, "I heard the first shot and I turned. I saw that the first shot went in a piece of paper and the piece of paper was burning; then I saw a woman with a revolver in her hand, and she fired the second shot, and I saw the second shot went into his back, and I saw exactly the smoke; then he said, 'Holy Virgin,' and the man ran away."

The witness Rosa testified that he was standing outside of his store and heard the report of a pistol. "I turned around; I saw then the second shot going towards Cignarale; the man ran away, the woman running after." The pistol was a five-barreled revolver, and when examined, it was found that two of the barrels had been discharged and three of the barrels were still loaded.

The autopsy disclosed that the ball entered the left side of the deceased, at about the ninth rib, and passed diagonally through the heart, and lodged in the right lung. The defendant testified that in shooting her husband she acted in self-defense, and in corroboration of this theory gave evidence before referred to, tending to show that her husband frequently maltreated and abused her, sometimes kicking and striking her with great violence; that she had been

driven from her home; that he had thereafter dogged and pursued her with intent to kill and harm her, going frequently to her several places of abode on Forsyth street and One Hundred and Twenty-fifth street, and demanding admittance; and that on the very morning of the day in question, he had appeared at her apartments on One Hundred Twenty-fifth street, and that, being denied admittance, and frightened away by the threat on her part to summon the landlord, he had vowed, as he left, that that should be her last day on earth.

An Italian, an acquaintance of the parties, testified that on the same morning the deceased tried to borrow a revolver of the witness; and in reply to an inquiry what he wanted a revolver for, replied, "I decided that to-day I will be killed, or I will kill my prostitute wife." Another witness, a butcher, with whom both parties traded, testified, that a few minutes before the shooting, the deceased came to his shop in One Hundred and Tenth street, and paid him ten cents, borrowed money, and on leaving said, "I must see the end of my wife, and I want to spit in her face."

The defendant's account of the transaction is as follows: "I did my housework; then it was about between eleven and twelve o'clock; I went to buy things for the house."

Q. Where did you go?

A. I went to One Hundred and Tenth street, and for a block on One Hundred and Tenth street; I went on and was thinking; I was disturbed; then I saw him with a handkerchief in his hand wiping his nose; as soon as he saw me he put his handkerchief into his pocket, and gave me two slaps; I got scared, and I did not say a word to him; and I looked around if I could see a policeman; I did not say a word to him; I could not see any policeman; I went on to do my business; I walked along; whilst I was walking, I felt that he seized me by the arm; he said, "Chiara, Chiara;" and I turned around to look into his face; he turned me around; "I say, you don't want to go about your business; let me go, Antonio;" he said, "No, I want to

reason with you ; I gave you two slaps, because you did not want this morning to open the door ;" he says, " What for didn't you open the door ? I am your husband ;" I said, " Yes, you are my husband, I do not deny it ; you chased me out ; to whom shall I go ? since I came from Italy here, where shall I go ? If I would not have met good people, you would have left me in the street to do bad things ; " then he said, " Well, I was sure that you can do that ;" then he said, " By the bye, come, let us go near the river ; let us take a walk together, I have to tell you something ;" I said, " I cannot go," because he did not look to me very sincere ; because he was always looking in front and behind, always turning around ; then I said, " If you have anything to tell me, tell me it right here ;" then he said : " Well, I will tell you right here ;" then he said : " De Mora Marro told me that you sleep with Antonio D'Andrea ;" I said : " De Mora Marro, because I refused to receive him into my house in Forsyth street, says that I live with Antonio D'Andrea ; if I would have received him into the house he would not say that I lived with Antonia D'Andrea ;" I said : " Well, God knows all about me ;" and then I said to him : " Don't you know that I cannot do those things ; for you I was not good, but for the others I am good enough," saying it in a kind of reproach. " Well, you know if I am not good for you, I am not good for another ; that is the sense of it." He said : " Tell me the truth, if it is not the truth I will break De Mora Marro's head ;" then he said : " I do not believe it ; I was not willing to believe it, because I know that you are sick ;" and saying that, then he looked that way around the other side and he took out with his left hand the razor out of his pocket, he says : " I want to kill you." Seeing the razor I say : " Ah, you betrayer." I retreated one pace back and I took my revolver out ; then when he saw the revolver, he says : " Well, there will be a time for you ;" then he turned around and went in an opposite direction ; when I heard him say : " That time will come for you," I just fired to the ground ; he was four or five paces away

from me, about five feet away from me, then; then when I fired he turned around, with the razor open, he says: " My God, happen what may," and he jumped at me with his arm raised, just in a way to cut my head off; then having the revolver in my hand ; I fired the revolver ; I did not know where the revolver went ; when the shot went.

Q. At the time you fired that shot at your husband, did you believe you were in danger of being grievously hurt?

A. I thought that he will go to kill me.

Q. And was that the reason that you fired?

A. Yes, sir.

Q. To prevent yourself being cut with the razor?

A. Yes, sir.

The defendant also testified that she took the pistol with her to protect herself against her husband. In her examination before the magistrate after her arrest, she stated : "I am guilty of the charge. I shot my husband in order to defend myself, because he insulted me."

On examining the clothing of the deceased after his death a razor was found in his inside vest pocket, wrapped in an old piece of paper worn off at the ends and tied with a string. No other razor was found, nor does it appear that the deceased had any other.

The defendant's counsel took some exceptions to the rulrulings of the court on the trial in respect to the admission and rejection of evidence, and also to the charge. They are not urged as ground of error on this appeal, and upon examination it is clear that none of them disclose any error committed on the trial to the prejudice of the defendant. The case was submitted to the jury by the learned recorder in a full, fair and impartial charge, who found the defendant guilty of murder in the first degree.

Two reasons only are argued for the reversal of the judgment:

*First.* That the verdict is against the weight of evidence, and justice requires a new trial.

*Secoud.* That the defendant could not legally be con-

victed of any crime higher than murder in the second degree by reason of a prior plea to the same indictment of guilty of murder in the second degree, accepted by the court. The facts upon which this question arises are stated in the opinion.

*William F. Howe*, for defendant, appellant.

*John R. Fellows*, district attorney (*McKenzie Semple*, assistant), for the people, respondents.

ANDREWS, J.—The jurisdiction vested in this court by chapter 493 of the Laws of 1887, to order a new trial on appeal from a judgment of conviction in a capital case, where it is satisfied that the verdict was against the weight of evidence, or that justice requires a new trial, is invoked upon this appeal. The power to grant a new trial upon these grounds formerly pertained exclusively to the Supreme Court. But as now, by the act of 1887, an appeal lies directly to this court from a judgment of death rendered by the trial court, without any intermediate review in the Supreme Court, the power to grant a new trial under the same circumstances as it was formerly exercised by the Supreme Court, was, with manifest propriety and justice, conferred upon this court.

It was not, however, the intention of the statute of 1887, to confer upon this court a new power not theretofore exercised by appellate courts to grant new trials in criminal cases, or to confer a power to supervise or set aside the judgments of courts of original jurisdiction upon other or different considerations than those which governed the Supreme Court in similar cases. The statute simply invested this court with the jurisdiction formerly possessed by the Supreme Court to grant new trials on the merits, a change made necessary by the change of procedure.

Therefore in determining whether in a case brought to this court under the statute of 1887, a new trial should be granted on the merits, this court is bound by the settled

rules governing appellate courts possessing and exercising this jurisdiction. It is a cardinal principle in our jurisdiction, that the jury is the ultimate tribunal for the investigation and determination of questions of fact. It is no more the province of an appellate court than of the court of original instance, to determine controverted questions of fact arising upon conflicting evidence. Neither can lawfully usurp the appropriate function of the jury, and neither can substitute its own judgment for that of the jury where the facts are reasonably capable of diverse or opposing inferences. But the power to grant new trials is an essential safeguard against the miscarriage of justice, and in nearly all judicial systems the courts, in some form, have been invested with this power as a protection against passion, prejudice, mistake, perversity, or corruption on the part of jurors, and these are the matters to be considered by the court when called upon to supervise the findings of a jury.

In very many, if not most, criminal cases, there is a conflict of evidence upon material facts. It is primarily the province and duty of the jury to determine where the truth lies. The case may be nearly balanced. There must, according to settled principles of criminal law, be a preponderance of evidence against the defendant, to authorize a conviction. It is the duty of juries to be guided by this rule. But on which side is the preponderance of evidence cannot be determined by fixed rules.

It must be left, after all, to the good sense of the jury, under proper instructions as to the law, to determine the question. The court may entertain some doubt whether the fact was properly found by the jury, and in case of serious doubt, especially in a criminal case, it may, if in its opinion justice requires it, order a new trial. But the mere fact that there is a conflict in the evidence is not alone a ground for a new trial. The court must be able, upon a review of the proceedings, to reach the conclusion that injustice has probably been done on the trial before it is jus-

tified in setting aside the verdict of the jury. In the nature of the inquiry, the matter is not capable of exact rules or definition, and the court must act in the exercise of a discretion, having reference to the circumstances of the particular case.

The court would not, we think, be justified in granting a new trial in this case, under the act of 1887. There is much to appeal to the sympathies in the unfortunate condition of the defendant. But the evidence justified the jury in finding that in shooting her husband she acted deliberately and with premeditation, with the intention of taking his life. The principal facts proved on the trial on either side are recapitulated in the preliminary statement, and need not be repeated. The defendant, before leaving her rooms on One Hundred and Twenty-fifth street, shortly before the homicide, armed herself with the pistol. According to the testimony of disinterested witnesses of the transaction, she was first seen following her husband on the avenue, and deliberately shot him from behind while he was walking ahead of her, apparently unconscious of her presence in the vicinity. The story of the defendant of the occurrence immediately preceding the shooting not only is without any corroboration, but is irreconcilably inconsistent with the facts as observed by the other witnesses. Her story that the deceased attempted to attack her with a razor, is not only inconsistent with the testimony of the other eye-witnesses of the shooting, but seems conclusively disproved by the uncontroverted evidence that the razor of the deceased was found after his death in his inside vest pocket, wrapped in paper and tied around with a string, and no other razor was found in the vicinity.

Upon the whole facts we cannot say that the verdict was against the weight and preponderance of evidence, or that justice requires a new trial. The defendant may have been driven almost to desperation by the wrongs and insults of her husband; but the circumstances of the shooting, as the

jury had a right to find them, do not show that the homi-
cide was either justifiable, or that the defendant acted in
the heat of passion, or without an intent to kill.

The remaining question arises upon the claim made by
the counsel for the defendant, that on a former trial under
the indictment the defendant had, by legal intendment,
been acquitted of the principal offense of murder in the
first degree, which was a bar to a subsequent trial and con-
viction for that degree of homicide.   The facts upon which
this question depends are briefly these: On a former trial
the defendant upon arraignment pleaded not guilty, and a
jury was impaneled and sworn to try the issue.   The
trial proceeded and witnesses were sworn and examined in
behalf of the prosecution.

At the conclusion of the case on the part of the people,
by mutual consent of the defendant, the district attorney
and the court, the jury were discharged and the defendant
withdrew her plea of not guilty and pleaded guilty of mur-
der in the second degree, which latter plea was accepted by
the court, but no sentence was pronounced.   On a subse-
quent day the defendant, by her counsel, applied to the court
to be permitted to withdraw her plea of guilty of murder
in the second degree, and, the district attorney consenting
thereto, the court allowed the motion, and the defendant
thereupon withdrew her said plea and again pleaded not
guilty to the indictment.   The grounds upon which the ap-
plication to withdraw the former plea was made, or upon
which it was granted, do not appear.   The trial from which
the present appeal is taken was thereafter had under the
general plea of not guilty so interposed, which resulted in
the present conviction.   It is now claimed that the accept-
ance of the plea of guilty of murder in the second degree,
on the former trial, was in law an acquittal of the defend-
ant of the crime of murder in the first degree, which ac-
quittal stood in full force and unimpaired by the subsequent
proceedings.   It would be a complete answer to this claim

in point of law, that the defense of former acquittal must be pleaded, and that in the absence of a plea setting it up, the question cannot be raised. This was the rule before the enactment of the Code of Criminal Procedure and is recognized by that statute. People v. Benjamin, 2 *Park.* 201; *Code,* §§ 332, 339. See also State v. Barnes, 32 *Me.* 530; *Bishop Crim. Pro.* §§ 806, 813.

But in a capital case, if it was made to appear that there had been a former acquittal, we should deem it our duty, under the statute of 1887, to take notice of the fact, although not presented by a formal plea.

The contention that the acceptance of the plea of guilty of murder in the second degree on the former trial, was in law an acquittal of the higher offense, notwithstanding its withdrawal at the instance of the defendant, is placed on the supposed analogy with those cases in which it has been held that where a defendant, indicted for murder, is put on his trial for that crime, a conviction of murder in the second degree, or of manslaughter, is an acquittal of any higher degree of the crime than that for which he was convicted, and that, although the defendant succeeds in procuring a reversal of the judgment convicting him of the lesser offense, he does not thereby waive the benefit of the former verdict as an acquittal for the higher offense, but may insist upon it, and he cannot thereafter be tried for any higher degree of the crime than that of which he was formerly convicted.

The preponderating weight of authority sustains the general principle as above stated. Slaughter v. State, 6 *Humph.* 411; State v. Ross, 29 *Mo.* 32; People v. Gilmore, 4 *Cal.* 378; State v. Hornsby, 32 *La. An.* 1268; State v. Kittle, 2 *Tyler* ( *Vt.*), 472.

In Ohio a different rule prevails. Jarvis v. State, 19 *Ohio St.* 585. In this State the same doctrine is recognized in cases of inferior offenses. Guenther v. People, 24 *N. Y.* 100; People v. Dowling, 84 *Id.* 478.

The question has not arisen in this State, so far as we know, on an indictment for murder, but *a fortiori* if the doctrine contended for is applicable in case of minor offenses, it is to those of the higher grade. In determining whether the principle of these decisions is applicable in the present case, the ratio *decidendi* is to be considered.

The doctrine that a man once tried and convicted or acquitted of a crime on a valid indictment by a court of competent jurisdiction, cannot be tried again for the same offense, has its foundation in the principles of justice, and was a very ancient doctrine of the common law   It is embodied in that provision of the constitution of our State (article 1, section 6), which declares that "no person shall be subject to be twice put in jeopardy for the same offense." In declaring the application of this constitutional principle, it is well settled that an acquittal or conviction by verdict of a jury, although not followed by judgment or sentence, is an acquittal or conviction which protects an accused person against another trial, provided there was a competent court and a lawful indictment, or, in case of conviction, so long as the judgment remains unreversed. And whether the conviction was on confession or by verdict, the rule was the same.    Shepherd *v.* People, 25 *N. Y.* 406, and cases cited.

But in this State, and generally elsewhere, a party convicted is permitted in some form to have a review for the purpose of correcting any errors of fact or law which may have been committed on the trial. And it became a settled qualification of the doctrine that a party could not be twice tried for the same offense, that by seeking and obtaining a new trial for error, he thereby waived the constitutional protection and could be again tried for the offense of which he formerly was convicted. United States *v.* Keen, 1 *McLean*, 435 ; People *v.* Dowling, *supra*. But this doctrine in turn was limited so as to protect a defendant who secured a reversal and new trial, from being again put on trial

for a higher grade of the same offense, or for another offense included in the same indictment, of which higher grade, or of which other offense the first conviction was by inference an acquittal. So it was held that a verdict of conviction of one of several offenses charged in an indictment, or of a lesser degree of a single offense, implied, although the verdict was silent on the subject, that the jury found the defendant not guilty or such other offenses, or of the higher degrees of the same offense.

It was on the theory that the verdict was separate and divisible, being both a verdict of acquittal and conviction, and that there was no inconsistency between a claim that the defendant was not guilty even of that of which he was convicted, and the claim that the verdict still stood as an acquittal of the other matters charged in the indictment, that the defendant was permitted on a new trial to urge the former verdict as an acquittal of all the matters charged other than that on which the conviction was had.

The reason of the rule has, we think, no application to the present case. The confession of guilty of murder in the second degree having been voluntarily withdrawn by the defendant on her application to the court, removed, as is justly claimed by the assistant district attorney in his very able argument, the only proofs which sustained alike the conviction, as also the constructive acquittal, of the defendant of the higher crime. It left the case without any plea whatever, until the defendant again interposed her general plea of not guilty to the whole indictment, and in a criminal case an arraignment and plea are essential to a valid trial and judgment. People v. Bradner, 107 *N. Y.* 1, and cases cited.

The waiver wrought by the withdrawal of the plea involved the waiver of all which depended on the plea, and this included a waiver of the benefit of the implication which existed, so long as the plea remained, of an acquittal of the higher crime.

We think that neither upon reason nor principle can the defense of former jeopardy be maintained. As to waiver in criminal cases, see Pierson *v.* People, 79 *N. Y.* 424, and cases cited.

The case of Kring *v.* Missouri (107 *U. S.* 221) does not, we think, decide the question now presented. In that case there was a confession of the crime of murder in the second degree, followed by sentence and judgment in the State court of Missouri. The sentence was set aside by the appellate court of the State, because, in violation of an understanding between the prosecuting officer, the defendant and the court, as to the length of sentence in case the defendant should plead guilty, and the appellate court remanded the case to the lower court for further proceedings. When the cause was again moved, the defendant stood on his plea of guilty of murder in the second degree and its acceptance by the court, and refused to withdraw it. The court thereupon directed a plea of not guilty to be put upon the record, against the defendant's protest, and he was thereupon tried and convicted of murder in the first degree. The judgment was reversed by the Supreme Court of the United States.

In the present case there was neither sentence nor judgment on the plea, and the defendant voluntarily withdrew the plea and pleaded over to the indictment. It is quite clear from the prevailing opinion in the Kring case that the absence of these circumstances in that case had a controlling influence. We are of opinion, therefore, that the defense of former acquittal, if properly pleaded, could not have prevailed.

We deem it unnecessary to consider whether the legislature, by sections 464 and 544 of the Code of Criminal Procedure, have not changed the rule that a conviction for a lesser grade of an offense, or of one of two offenses charged in an indictment, imports an acquittal of the higher grade of the offense or of the other distinct offense. It is

assumed in the Kring case that it would be competent for the legislature to make such a change, applicable to future cases.

The judgment should be affirmed.

All concur, except GRAY, J., not voting.

---

NOTE.—As to the effect of a former conviction of a lesser degree of the offense charged, see People *v.* Palmer, 5 *N. Y. Crim. Rep.* 101 ; affirmed, 109 *N. Y.* 413. See especially a note at 5 *N. Y. Crim. Rep.* 114.

In a recent Iowa case (State *v.* Clark, 69 *Iowa*, 196), after a verdict of guilty, a motion in arrest of judgment was sustained and the indictment set aside. It was held that the verdict having been virtually set aside, another prosecution was not barred under a statutory provision (Iowa Code, § 4364), that " a conviction or acquittal, by judgment, upon a verdict, shall bar another prosecution for the same offense."

As to self-defense in cases of homicide, see People *v.* Lyon, *infra*, p. 105; and note to that case, p. 119 ; also, People *v.* McGrath, *infra*, p. 152; and People *v.* Reich, *infra*, p. 103.