THE PEOPLE OF THE STATE OF NEW YORK, Respondents, *v.* JOHN KELLY, Appellant.

*Court of Appeals, April* 16, 1889.

1. *Appeals. Criminal cases.*—In pursuance of the provisions of the Code of Criminal Procedure, as amended by chap. 493, Laws of 1887, a defendant convicted of murder in the first degree may appeal directly to the court of appeals from the judgment entered upon his conviction.

2. *Same.*—This provision was not intended to authorize the court of appeals to review findings of fact, founded upon sufficient evidence, made by the jury, or to reverse judgments simply because of a difference of opinion on the facts between this court and the jury; but was intended to invest the court with the power of ordering a new trial in cases where, upon a consideration of the whole case, it is manifest that injustice has been done, though the question has not been properly raised by exceptions in the court below; but it is an authority which must be exercised under the restraint of settled rules, and in accordance with established principles of law regulating and defining the duties of appellate tribunals in reviewing the judgments of trial courts.

3. *Criminal law. Words no excuse.*—It is not sufficient to excuse a person from the consequences of a fatal assault upon another, that he has been provoked thereto by an angry controversy of words alone, however aggravating they may have been. When such language induces a personal conflict of strength between persons of comparatively equal ability to inflict injury, the seizure of a dangerous weapon, accidentally near, by one of the parties, and a blow given in the heat of passion, might be regarded by the jury as excusable.

4. *Same. Intent.*—But, when the parties are unequal in strength, and the assaulting party, being the stronger, and having no reason to apprehend physical injury from the other uses a dangerous weapon, the question whether it is used with homicidal intent is one of fact for the jury.

5. *Same. Premeditation.*—The fact that, when an affray was apparently terminated, and deceased had retired to a remote corner of the room, with an evident intent to avoid the defendant, the latter, after an opportunity to reflect upon his course of action, then sought her out, armed with a new and dangerous weapon, and with the obvious intention of continuing the affray, is very persuasive proof of a deliberate and determined purpose on his part.

6. *Witnesses. Refreshing memory.*—Where the fact that a witness for the prosecution has omitted to testify to a material fact on his direct examination must be ascribed, either to his forgetfulness or a disposition to befriend the accused by its suppression, the district attorney may, with the avowed purpose of refreshing his recollection, ask him if he had not previously testified to certain other facts specified, in case he has given no evidence conflicting with this statement, and it in no degree tended to contradict his testimony.

*Edwin Hicks*, for appellant.

*Frank Rice*, for respondents.

RUGER, Ch. J.—The defendant was indicted of the crime of murder in the first degree, for killing one Eleanor O'Shea, by striking her upon the head with a hammer, at the town of Geneva, in the county of Ontario, on the 6th day of November, 1888. At a trial in the court of oyer and terminer, held in said county, in December, 1888, the defendant was convicted of the crime charged, and, in pursuance of the provisions of the Code of Criminal Procedure, as amended by chapter 493 of the Laws of 1887, has appealed directly to this court from the judgment entered upon his conviction. Upon such an appeal we are required to examine the whole case, and determine whether, in our opinion, "the verdict was against the weight of evidence, or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below."

We do not think that this provision was intended to au-

thorize this court to review findings of fact, founded upon sufficient evidence, made by the jury, or to reverse judgments simply because of a difference of opinion on the facts between this court and the jury ; but was intended to invest the court with the power of ordering a new trial in cases where, upon a consideration of the whole case, it is manifest that injustice has been done, although the question has not been properly raised by exceptions in the court below.    People *v.* Cignarale, 110 N. Y. 23 ; 16 N. Y. State Rep. 165.

This provision, undoubtedly, gives great latitude of authority to the court in granting new trials to convicted offenders, but it is an authority which must be exercised under the restraint of settled rules, and in accordance with established principles of law regulating and defining the duties of appellate tribunals in reviewing the judgments of trial courts.

It is claimed that a consideration of the evidence shows a lack of proof of that premeditation and deliberation in the commission of the offense which is required by the statute to sustain a conviction.

There is no serious question in the case, but that Eleanor O'Shea came to her death in consequence of a blow inflicted with an iron hammer upon her head by John Kelly, or but that the blow was intentionally given for the purpose of inflicting serious bodily injury upon said O'Shea. The principal question in the case is the determination of the particular intent with which the defendant struck the blow.    This can be ascertained only by an examination of the facts proved on the trial.    The evidence on the subject is given almost wholly by the witness, Mahar, who was apparently friendly to the defendant, and betrayed a slight, but perceptible, disposition, not only by his evidence, but also by his failure to recollect inculpatory circumstances, to favor him in his version of the transaction.    The affray occurred about ten o'clock in the evening, at the house of one

George Kippen, who was a farmer, living about two and one half miles from the village of Geneva. The household consisted, at the time in question, of George Kippen, Margaret Kippen, his daughter, aged about thirty years, Eleanor O'Shea, his housekeeper, aged about forty-six, and one Mahar, the witness, who was of the age of about sixty-eight years. The defendant was the foreman of the farm, and had worked for Kippen in that capacity about fifteen years. He was a married man with children grown up, and was then living in a tenant house on the same farm about eighty rods distant from Kippen's house, but was separated from his family, and took his meals generally at Kippen's. On the day in question, he had been at Geneva through the afternoon and evening, and returned to Kippen's about nine o'clock P.M. He went directly to the barn to put out his horse. Margaret Kippen followed him there with a lantern, leaving O'Shea and Mahar in the kitchen of the house. Margaret and O'Shea had immediately previous to defendant's return had an angry and violent controversy growing out of a charge made by O'Shea that Margaret went to the barn to see defendant for improper purposes, and forbidding her from going there any more. Margaret insisted upon going, and did so. After the lapse of a few minutes, Margaret returned to the house, and was soon followed by defendant. O'Shea then again commenced her imputations upon Margaret's chastity, and accused her of being unduly intimate with Kelly.

Kelly then asked her what authority she had to charge him with such conduct, and she replied that she had Mr. Kippen for authority and what she knew herself and what Margaret had told her. Kelly then asked her, " Do you say I am a whoremaster ? " and she rose up and said, " Yes, I do." Kelly immediately struck her with his fist, knocking her down near the stove in the centre of the north side of the room, and, while she was on the floor, kicked her on the breast, head and shoulders with his boot. She then ran

up hurriedly and seized a tea kettle standing on the stove and exclaimed, "I will scald you," and struck with it at Mr. Kelly. Thereupon a squabble ensued between Kelly and Margaret on one side and O'Shea on the other, which resulted in their getting the tea pot away from her. O'Shea then assaulted Margaret and shoved or drove her into the hall through a door near the northeast corner of the kitchen, and said to her, "I will smash you if you don't keep your hands off of me."

It would appear that Margaret remained in the hall until after the fatal blow was struck. About this time Mahar said to Kelly that he had better quit and approached him near the middle of the room, and Kelly told him "to keep away." Mahar then put up his hands and Kelly put his hands against those of Mahar, and crowded him back into the northwest corner of the room, where he remained during the rest of the affray.

When O'Shea returned from the hall and passing Kelly went to the southwest corner of the room without making any remarks, Kelly stood in the northeast corner near a mantel upon which were two or three hammers usually kept in that place. After a brief interval he walked coolly across the room to the opposite corner where O'Shea stood and speaking low and quietly said: "Can you prove what you said? Do you say I am a whoremaster?" She says "I do," upon which, in the language of Mahar, Kelly "up with his hand and struck her with the hammer on the head." O'Shea sank to the floor on her knee and Kelly poked at her with his foot. O'Shea then got up and says: "Mr. Mahar, you know all this, and struggled to a chair standing on the south side of the room near the table, a few feet from where she was struck, and sat down. While sitting there Margaret came up with a stick of stove wood and struck at her several times, probably hitting her face, breast and legs some apparently trifling blows. Then O'Shea got up and staggered along the south and east side of the room to a pantry open-

ing from the northeast corner of the kitchen and passed through the door, closing it behind her.

Soon after this she was heard to fall on the floor. Here she remained, unobserved and unattended, until the next morning, when she was discovered lying in a pool of blood in a dying condition, and expired in the evening of that day. Kelly remained in the kitchen a short time, when he went into George Kippen's room on the same floor, and, after a short conversation, returned with him to the kitchen and remarked, " By Christ, whoever will accuse me of being a whoremaster in this house, or an adulterer, if I had a pistol I would send the contents of it right through him." He then walked over to Mahar and told him to put on his things and come out doors. As they went out, Margaret said to Mahar, " That is right Tom, go out doors and go away from here and don't come around again this night." Mahar went to the barn with Kelly, who, after doing some chores, returned towards the house, when Mahar said to him, " I guess she is hurt, I think she ought to be seen to." Kelly replied, " Wait here, I want to go to the house," and taking a lantern went to the pantry window and looked in. He soon returned and said, " Let's go to my house." Mahar replied, " I will sleep in the barn and I guess I won't go up there to-night." Kelly says, " No you won't, you must come with me," and Mahar went with him and remained through the night with Kelly. About seven o'clock the next morning Kelly and Mahar returned to the barn, when Mahar said, " John, I am afraid she is hurt," to which Kelly replied, " It is good enough for the d——n thing, she might attend to her business." He also said, " The da——nd rotten thing, she is always making trouble." It also appeared that Kelly and O'Shea had, at various times previous to the affray, had angry controversies on the subject of his relations with Margaret, and on one occasion nearly came to blows. He had frequently before this said that he wouldn't have the d——d thing there and would send her away; that he didn't want her there, dan

similar remarks to various persons.   After his arrest and on his way to jail, the day after the homicide, on being re-proached for his conduct, he said, " A man can't control himself when everybody is picking on him and his anger gets the best of him."   At the time of the affray Kelly was under the influence of liquor, and he, as well as O'Shea, in the language of the witness, were very angry, and acted like crazy people.

Upon this evidence it was, we think, a fair question for the jury to determine whether the death of O'Shea was produced by that degree of deliberation and premeditation which rendered it murder in the first degree.

So far as this case is concerned the inquiry is, whether the evidence establishes the fact that Eleanor O'Shea was killed from a deliberate and premeditated design to effect her death.   Section 183, Penal Code.   If she was, then the defendant was guilty of murder in the first degree, and was properly convicted of the offense.   It is not sufficient to excuse a person from the consequences of a fatal assault upon another, that he has been provoked thereto by an angry controversy of words alone, however aggravating they may have been; but when such language induces a personal conflict of strength between parties of compara-tively equal ability to *inflict injury,* the seizure of a danger-ous weapon, accidentally near, by one of the parties and a blow given in the heat of passion, might be regarded by a jury as excusable.   This, however, is not the rule where the parties are unequal in strength and the assaulting party has no reason to apprehend physical injury from the other. Here the violence was initiated by the defendant; and, *although he had no reason to anticipate adequate resistance,* it was followed up and continued after his adversary had been silenced and disarmed.

That there was abundant evidence of deliberation and premeditation in striking the blow which caused death, we do not consider a debatable question in the case, but whether

it was delivered with homicidal intent is a question about which some difference of opinion might exist.

We think, however, upon the whole evidence that the jury who saw the parties and their witnesses and heard their evidence, and could judge of their intelligence and credibility, had better opportunities for arriving at a correct conclusion in respect to the question than an appellate tribunal possesses.

The evidence that the affray had apparently terminated after O'Shea excluded Margaret from the room, and retired to the corner most remote from Kelly, with an evident intent to avoid him, and that he then sought her out, after an opportunity to reflect upon his course of action, with the obvious purpose of continuing the affray armed with a new and dangerous weapon, is very persuasive proof of a deliberate and determined purpose on his part. People *v.* Sullivan, 7 N. Y. 396.

It is obvious that Kelly never considered himself in danger of bodily harm from O'Shea ; he had silenced her tongue, and she showed no disposition to renew the controversy, and all apparent reason for continuing it had ceased, except a purpose on his part to inflict punishment upon her. He then, apparently, armed himself with the hammer, a dangerous if not deadly weapon, and proceeded across the room to attack a defenseless and unresisting woman, not possibly with the intention of striking her in the first instance, but evidently with a view of compelling in some way a retraction of her charges against him. In the event that she refused, it was a natural inference from the evidence that he intended to strike her on the head, a vulnerable and vital spot, with the consequences which would naturally follow from such a blow. It is not possible that he could have supposed it would be harmless, and it is difficult to see how he could have expected it would be otherwise than fatal. The indifference with which he witnessed her struggle to reach the pantry, and his peremptory disposition of Mahar

for the night, thus removing the only person from the house who was friendly to the deceased and capable and willing to render assistance in her extremity, showed a cruel disposition and a reckless disregard of human life and bore strongly upon the intent with which the blow was inflicted. That he considered the provocation given to him by O'Shea a sufficient reason for killing a human being was ostentatiously avowed by him immediately after the affray, and might fairly have been considered by the jury as an attempted justification of consequences which he then apprehended and probably premeditated.  The hindrance which O'Shea had for a long time presented to the continuance of his illicit intercourse with his paramour, furnishes a motive for the crime, which might have been considered by the jury sufficiently strong to induce him to attempt the life of the deceased.

We are, therefore, on the whole case, of the opinion that the evidence supports the verdict of the jury, and that there is no sufficient reason in the facts of the case to authorize the conclusion that injustice has been done the defendant by the judgment appealed from.

The only other point made by the appellant of any importance is that raised by the objection to questions put to the witness Mahar by the people, respecting testimony previously given by him before the committing magistrate and the grand jury.

Mahar had omitted to testify in detail to the movements of Kelly between the time when the deceased returned to the kitchen and the infliction of the fatal blow.   With the obvious and avowed purpose of refreshing his recollection, the district attorney asked whether he had not previously sworn that Kelly moved coolly across from the northeast to the southwest corner of the room where O'Shea stood, and, also whether Kelly did not then address her in a low and quiet tone of voice.

The witness admitted that he so testified, and upon the

further question as to whether that was the fact, he answered that it was. This was certainly quite material evidence and, if it was true, was competent on the part of the people. The fact that he omitted to testify to it on his direct examination must be ascribed either to his forgetfulness or a disposition to befriend the accused by its suppression. He had given no evidence conflicting with this statement, and it tended in no degree to contradict his testimony.

The manner in which it was drawn out might affect the credibility of the witness with the jury, but having affirmed the truth of the facts, aside from his admissions as to his testimony on the previous occasion, it was the province of the jury to give such credit to his evidence as it was entitled to.

We are of the opinion, within the rule laid down in Bullard v. Pearsall (53 N. Y. 230), that it was proper for the people to refresh the recollection of the witness in the manner pursued in this case.

Several exceptions were taken to the rulings of the court upon challenges to jurors made by the accused, and we are of the opinion that none of them were well taken. Thomas v. People, 67 N. Y. 218; People v. Carpenter, 102 Id. 238; 1 N. Y. State Rep. 648.

We have examined other points made by the appellant on the argument with the care which the importance of the case requires, but are of the opinion that no errors were committed by the trial court which authorize a reversal of the judgment of conviction.

The judgment should, therefore, be affirmed.

All concur.

NOTE ON THE EXTENT OF REVIEW BY THE COURT OF APPEALS UNDER
SECTION 528 OF THE CRIMINAL CODE.

In People v. Kelley, above reported, the defendant was indicted for the crime of murder in the first degree. At a trial in the court of oyer and terminer, he was convicted of the crime charged, and, in pursuance of the

provisions of the Code of Criminal Procedure, as amended by chap. 493 of the Laws of 1887, appealed directly to the court of appeals from the judgment entered upon his conviction.

The amendment referred to reads as follows:

§ 528 . . . When the judgment is of death, the court of appeals may order a new trial, if it be satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial, whether any exceptions shall have been taken or not, in the court below . . . The amendment herein shall not affect any appeal taken to and pending in the supreme court or court of appeals, at the time this act shall become a law.

The court held in this case that, upon such an appeal, it was required to examine the whole case and determine whether, in its opinion, the verdict was against the weight of evidence, or against law, or that justice requires a new trial, whether any exceptions shall have been taken or not in the court below.

This provision was not intended to authorize the court of appeals to review findings of fact, founded upon sufficient evidence, made by the jury, or to reverse judgments simply because of a difference of opinion between the said appellate court and the jury. But it was intended to invest the court with the power of ordering a new trial in cases where, upon a consideration of the whole case, it is manifest that injustice has been done, though the question has not been properly raised by exceptions in the court below. Id.; People *v.* Cignarale, 110 N. Y. 23.

This provision undoubtedly gives great latitude of authority to the court in granting new trials to convicted offenders, but it is an authority which must be exercised under the restraint of settled rules and in accordance with established principles of law regulating and defining the duties of appellate tribunals in reviewing the judgments of trial courts. Id.

The jurisdiction vested in the court of appeals by chap. 493 of the Laws of 1887, to order a new trial on appeal from a judgment of conviction in a capital case, where it is satisfied that the verdict was against the weight of evidence, or that justice requires a new trial, formerly pertained exclusively to the supreme court. But as now, by the act of 1887, an appeal lies directly to the court of appeals from a judgment of death rendered by the trial court, without any intermediate review in the supreme court, the power to grant a new trial under the same circumstances, as it was formerly exercised by the supreme court, was, with manifest propriety and justice, conferred upon the former court. People *v.* Cignarale, *ante.* But it was not the intention of the statute of 1887 to confer upon this court a new power not theretofore exercised by appellate courts to grant new trials in criminal cases, or to confer a power to supervise or set aside the judgments of courts of original jurisdiction upon other or different considerations than those which governed the supreme court in similar cases. The statute simply invested this court with a jurisdiction formerly possessed by the

242 PEOPLE OF STATE OF N. Y. *v.* KELLY.

Note on Review by Court of Appeals under Section 528, Criminal Code.

supreme court to grant new trials on the merits, which change was made necessary by the change of procedure.

Therefore, in determining whether, in a case brought to the court of appeals under the statute of 1887, a new trial should be granted on the merits, the court is bound by the settled rules governing appellate courts possessing and exercising this jurisdiction. It is a cardinal principle in our jurisprudence that the jury is the ultimate tribunal for the investigation and determination of questions of fact. Id. It is no more the province of an appellate court, than of the court of original instance, to determine controverted questions of fact arising upon conflicting evidence. Neither court can lawfully usurp the appropriate function of the jury; and neither can substitute its own judgment for that of the jury, where the facts are reasonably capable of diverse or opposing inferences. Id.; People *v.* Fish, Ct. of App., Jan. 13, 1891. But the power to grant new trials is an essential safeguard against the miscarriage of justice. And in nearly all judicial systems, the court in some form has been invested with this power as a protection against passion, prejudice, mistake, perversity or corruption on the part of the jurors. And these are matters to be considered by the court, when called upon to supervise the findings of a jury. As in very many, if not most, criminal cases, there is a conflict of evidence upon material facts, it is primarily the province and duty of the jury to determine where the truth lies. There must, according to settled principles of criminal law, be a preponderance of evidence against the defendant, to authorize a conviction. By this rule the jury must be guided. But on which side is the preponderence of evidence cannot be determined by fixed rules. It must be left, therefore, to the good sense of the jury, under proper instructions as to the law, to determine the question. The court may at times entertain some doubt, whether the fact was properly found by the jury; and, in case of serious doubt, especially in a criminal case, it may, if in its opinion justice requires it, order a new trial. But the mere fact that there is a conflict in the evidence is not alone a ground for a new trial. The court must be able, upon a review of the proceedings, to reach the conclusion that injustice has probably been done on the trial, before it is justified in setting aside the verdict of the jury. In the nature of the inquiry, the matter is not capable of exact rules or definitions, and the court must act in the exercise of its discretion, having reference to the circumstances of the particular case. People *v.* Cignarale, *ante.*

The powers conferred by this section are similar to those formerly given to this court in certain cases by chap. 337 of the Laws of 1855, as amended by chap. 330 of the Laws of 1858, and to the supreme court by § 527 of the Code of Criminal Procedure. O'Brien *v.* People, 36 N. Y. 276.

It was the intention of the legislature to vest the court of appeals with power, in its discretion, to disregard the neglect or omission of the accused to take the customary objection and exception on a trial, and grant a new trial, when such a course would be in furtherance of justice and conduce to

the humane administration of the law.   But the provisions do not authorize the appellate court to disregard the effect of valid exceptions taken by an accused party under trial, O'Brien *v.* People *ante*, or excuse such party from complying with the settled rules of practice applicable to the trial of criminal cases, or exempt him from the duty of presenting the usual and ordinary questions arising on the trial of an indictment.   People *v.* Driscoll, 107 N. Y. 414.

The omission of counsel for the defendant to make the proper objections and take exceptions to alleged erroneous proceedings would, under the amendment above referred to, seem to deprive him of the privilege of claiming, as matter of right in the appellate court, the benefit of errors occurring on the trial, and remit him to an appeal to the discretionary power of the appellate court, which arises when, upon an examination of the whole case, it appears affirmatively that injustice has been done to the accused in the result arrived at by the trial court.   In the discussion of the broad question, in the appellate tribunal, as to whether substantial justice has been done to the accused upon his trial, it is open to him now to urge a review upon the merits of the case, regardless of exceptions; but in reviewing the various incidental questions arising during the progress of the trial, and the exceptions taken to the admission or the exclusion of evidence, or to the instructions of the court, regard must still be had to the established rules of law regulating such proceedings. The effect to be ascribed to provisions similar to the one in question in appellate courts, has been heretofore the subject of some discussion in the cases, but without eliciting any certain or well-defined rule as to the precise extent and character of the jurisdiction conferred by such provision.   Id.; Wilke *v.* People, 53 N. Y. 525; Levy *v.* People, 80 Id. 327; Ferris *v.* People, 35 Id. 125; People *v.* McCann, 16 Id. 58; O'Brien *v.* People, *ante.*

The general rule derived from these authorities seems to be, to leave it discretionary with appellate courts, whether they will give effect to claims of error or illegality in particular cases, when the error is not pointed out on the trial, and objections and exceptions taken thereto in the usual manner.

In People *v.* Van Brunt, 108 N. Y. 656, the appeal to the supreme court was taken before the passage of the amendment of 1887 to § 528 of the Code of Criminal Procedure, but the appeal to the court of appeals was taken after its enactment.   And it was held that it is possible to construe the terms of the amendment distributively, and that the court of appeals ought to do so and not deny the prisoner the review upon the facts which he seeks, by any nice or critical construction of the amendment.

Where the appeal in a criminal case presents the gravest question which can occupy the attention of a judicial tribunal, the appellate court should patiently and carefully read the evidence and the proceeding on the trial with a desire to discover such proof of the defendant's innocence of the crime charged against him, as would enable it, in the discharge of its judicial

**244 PEOPLE OF STATE OF N. Y. v. KELLY.**

Note on Review by Court of Appeals under Section 528, Criminal Code.

obligations, to relieve him from the penalty imposed by the judgment from which the appeal has been taken. People v. Stone, 117 N. Y. 480.

The rules which should govern the court, in the exercise of the jurisdiction conferred by § 528 of the Code of Criminal Procedure, as amended by the statute of 1887, were stated in the case of People v. Cignarale, *ante.*

Where the case is one in which the only judgment to be pronounced upon conviction under the indictment is that of death, an appeal from such judgment to the court of appeals makes it the duty of this court to examine with very great care and attention the whole record for the purpose of discharging the duty imposed upon it by the legislature and determining whether upon that evidence justice does not require a new trial. People v. Lyons, 110 N. Y. 618. In making that examination, for the purpose of such a determination, the statute says it is not necessary that an exception shall have been taken to any decision made by the court below. Still, a defendant under this statute cannot, in this court, claim, as matter of right, the benefit of errors occurring on the trial, where no proper objection was made and no exception taken to the decision of the trial court. Such failure to make an objection and take proper exception deprives him of his claim, as a matter of right, to a reversal of the judgment of conviction. Under such circumstances, he can only ask that the court will determine, upon the whole case, the question whether justice requires, or does not require, a new trial, or whether the verdict was against the weight of evidence or against law. The court of appeals is then vested with power, in its discretion, to disregard the omission of objection and exception and review the case upon the merits. Id. People v. Driscoll, *ante.*

In the People v. Driscoll, *ante*, the defendant was tried in the court of general sessions of the city and county of New York, upon an indictment charging him with the crime of murder in the first degree, and was found guilty of the crime. Upon appeal to the general term of the supreme court, the judgment of conviction was affirmed. Subsequent to the passage of the statute of 1887, an appeal was taken to the court of appeals from the judgment of affirmance by the general term.

By chap. 493 of the Laws of 1887, § 528 of the Code of Criminal Procedure was so amended as to vest the court of appeals with jurisdiction to examine the record and determine upon the whole case, whether it is satisfied that the verdict was against the weight of evidence, or against law, or that justice requires a new trial whether any exceptions shall have been taken or not in the court below. This provision has very much enlarged the jurisdiction and the labors of the court of appeals, and requires it to review the facts in every capital case, and to determine whether, upon all of the evidence, there is in its opinion, good and sufficient reasons for setting aside the verdict of the jury and granting a new trial.

§ 528 of the Code of Criminal Procedure does not confer upon the court of appeals power, arbitrarily, to grant a new trial whenever it thinks justice may require it, but its jurisdiction in such a case is to be exercised

according to settled rules of law. People *v.* Fish, Ct. of App., Jan. 13, 1891. If there is a conflict in the evidence, or different inferences may be drawn therefrom, it is in the province of the jury to weigh the evidence and determine the facts, and their determination should not be interfered with by the court of appeals, unless it can see that such determination was against the clear weight of evidence, or was influenced in some way by passion, prejudice, mistake, perversion or corruption. Id. People *v.* Driscoll, *ante ;* People *v.* Cignarale, *ante ;* People *v.* Lyon, *ante ;* People *v.* Kelly, *ante ;* People *v.* Stone, *ante.*

The court of appeals is not authorized by the provisions of chap. 493 of the Laws of 1887 to interfere with the finding of the jury when supported by sufficient evidence, unless it appears from the whole record that injustice has been done. People *v.* Trezza, Ct. of App., Feb. 24, 1891; People *v.* Cignarale, *ante ;* People *v.* Kelly, *ante.*