The judgment below should, therefore, be affirmed.

All concur.

---

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* NICOLA TREZZA, Appellant.

*Court of Appeals, February* 24, 1891.

1. *Appeal. Criminal law.*—The court of appeals is not authorized by the provisions of chap. 493 of 1887 to interfere with the finding of the jury when supported by sufficient evidence, unless it appears from the whole record that injustice has been done.

2. *Homicide. Motive.*—To sustain an indictment for murder, it is not necessary to prove a motive. It is immaterial whether the acts of the accused, which result in the homicide, proceed from some undisclosed motive, or from general depravity of mind and a reckless disregard of human life. In the absence of lawful excuse or justification, these acts, in either case, establish the crime of murder in the first degree.

Appeal from judgment of the Kings county court of sessions, entered upon conviction of defendant of the crime of murder in the first degree.

*A. H. Dailey*, for appellant.

*John F. Clarke*, assistant district attorney, for respondents.

O'BRIEN, J.—The defendant was convicted in the Kings county court of sessions of the murder of Alexander Salvano at the town of Flatbush, one of the suburbs of Brooklyn, on the 6th day of April, 1890. There are no exceptions in

the record that raise any question of law upon which the
defendant is entitled to a new trial, and as we are not au-
thorized by the provisions of chap. 493 of the Laws of 1887
to interfere with the finding of the jury when supported by
sufficient evidence, unless it appears from the whole record
that injustice has been done, it is unnecessary to give more
than a brief summary of the facts upon which the judgment
rests. People *v.* Cignarale, 110 N. Y. 23 ; People *v.* Kelly,
113 N. Y. 647.

On the day that the homicide was committed, which was
Easter Sunday, the deceased was at his house in Flatbush
with his family, consisting of his wife, his sister, a married
daughter and her husband. In the afternoon a friend and
acquaintance of the deceased named Felicia Delucca called
and was present when the deceased was killed. About five
or six o'clock in the evening the defendant loudly knocked
at the door of the house and entered. The day was being
observed by the deceased and his family and the friend who
called in a festal manner, and the defendant shortly after
entering the house was invited by Salvano to partake of
some of the eatables on the table. The defendant declined,
saying that he was not hungry but wanted something to
drink, and suggested to deceased to send for some beer.
Some one of the family was about to go for the beer when
the deceased again requested the defendant to eat some-
thing.

The defendant said, in substance, that he did not come to
eat or to drink, but to " kill you or somebody else ; " and he
said, with an oath, " I won't go out of here unless I do some-
body harm." Then, according to the testimony of the pros-
ecution, he struck the table, and took a piece of meat on
the fork, saying, " The way I eat this beef I eat somebody's
blood." The deceased asked him if he " was fooling," and
the defendant repeated with an oath, " I mean to do it."
The deceased told him, " You had better go away about
your business, Nick, because this is Easter Sunday even-

ing.    There is no need to make trouble."    The defend-
ant again said, "I have come over here to do some
people harm."    After ordering the defendant out of the
house, and some more words, the deceased took hold of
him to put him out, and the defendant walked out of the
door which had been opened.    While the defendant was
going out he was seen to draw a five-barreled revolver from
his pocket and adjust it under his coat-sleeve.    When out-
side the door the defendant turned around facing the de-
ceased, who stood in, or just outside the door, and about six
feet away, and drew the revolver from his sleeve and fired
two shots at the deceased and another shot at his son-in-law.
At the time of firing the pistol the defendant said, "I will
kill you first, then I will kill everybody in the house."    A
bullet from one of the shots aimed at the deceased passed
through the heart, causing almost instant death.    The third
shot, which was aimed at Frank Murri, the son-in-law, passed
through his clothing without injuring him.    After firing
these three shots the defendant turned and fled with the re-
volver in his hand.    He was pursued by Murri, the son-in-
law, and Delucca, and after running about a hundred feet
he turned and fired another shot at them without effect.    He
continued to run until he reached the boulevard, when he
turned and ran back in the direction of the house where the
deceased lay.    When within about one hundred feet of the
house he tripped and fell and was then caught by Delucca
and after some resistance disarmed.

These facts are testified to by the sister of the deceased,
the son-in-law and Delucca, who were all present and wit-
nessed the interview which resulted in the death of Salvano.
The wife and daughter of the deceased were also in the house
when the defendant came there, but, it seems, had stepped
out before the threats and the shooting, to accompany some
one to the cars, and hearing the report of the shots when
about half a block away, returned and found him dead.

The principal witnesses on both sides were Italians unable

to speak the English language, and their testimony had to be taken through an interpreter.

From an examination of the record it would seem that the witnesses were unable or unwilling to fully relate the details of what occurred during the time that the defendant was in the house, which must have been at least half an hour ; and the case for the People does not disclose any motive for the defendant's acts.   But it was not denied that the defendant intentionally and deliberately fired the shot at Salvano which produced his death.   On the contrary, this is admitted by the defendant himself, who claimed that he acted in self-defense.   The evidence on this point presents an irreconcilable conflict between the witnesses for the People and those for the defense.   It is apparent that either one or the other set of witnesses testified falsely.   The defendant is the principal witness in support of the claim that the homicide was committed in self-defense.   In substance he testified that on the evening in question he was passing the house of the deceased in company with two friends ; that he requested the friends to remain outside while he went in and greeted the deceased and his family ; that he went in, and his friends remained outside ; that, after the greeting, the deceased invited him to have something to eat ; the defendant declined, saying that he was not hungry ; that the deceased became angry at this, and commenced to break the dishes and throw them on the floor.   The wife of the deceased then became angry on account of the breaking of the dishes, and requested her husband to let the defendant go away, and then scratched the defendant's face ; that the defendant, when about to leave, and, in fact, when outside the door, was set upon by the deceased, his sister, wife, and other members of the family with chairs and sticks ; that he received a blow on the back of the head from some one of them with a chair or stick, and that the deceased had a gun which he fired at the defendant while he was surrounded by the other members of the family who had followed him out of the house.   The defendant's

statement is that then he fired the shots that killed the deceased.

The testimony of the two other persons was, in substance, that they were in company with the defendant till he reached the house of the deceased; that then the defendant said he wanted to go in and bid the deceased and family " Good Easter; " that he went in and they remained outside sitting upon a rock or pile of stones thirty or forty paces from the door. That after waiting about twenty minutes the defendant came out of the house followed by six or seven persons, men and women, who were armed with sticks and chairs; that after they were three or four paces outside the door the deceased rushed out with a gun saying that he could " lick " four like the defendant; that he pointed the gun at the defendant and fired, and after that the revolver was discharged by defendant.

Aside from the improbable character of this story in all its details, the testimony was very much weakened on the cross-examination. It does not appear why they sat outside the house and saw their friend assaulted and Salvano killed without making their presence known to any one. Though they were, if their statement can be credited, but a very short distance from the house during the alleged affray that resulted in the death of Salvano, and during the flight and capture of the defendant, they were not seen by any of the persons who lived in the house, nor did either of them, prior to the trial, publicly disclose the fact that they were eye-witnesses to these momentous transactions, although an investigation was had before the coroner immediately after the killing. Moreover, the testimony of the defendant and these two witnesses was contradicted by five witnesses who were members of the family of the deceased, and present when the defendant entered the house. These witnesses were the widow, sister, daughter and son-in-law of deceased, and Delucca. They deny that the deceased threw the dishes on the floor, or broke any of them, or that the wife scolded

or slapped his face, or that any one made any assault upon him, with sticks, chairs or otherwise, as sworn to by the defendant. These witnesses also show that the only gun that the deceased had was an old one with but a single barrel which he had purchased some time before in his business, which was that of a junk dealer, for about forty cents, and which after the shooting was found by the police and a member of the family in the loft of the barn, where it had been since it was purchased, covered with rust, unfit for use and clearly indicating from its appearance that it had not been recently used.

The claim that the killing was done in self-defense depended upon the statement of the defendant and the two witnesses referred to that the deceased had a double-barreled gun in his hands; that he had threatened to use it and had actually used it by firing a shot, and according to one of the witnesses two shots, at the defendant. This gun was not found around the premises by any one. The firing of the fatal shot brought to the house in a very short time not only the police but other persons outside the family of the deceased, and if there is any truth in the statement that Salvano died with a gun in his hands, the circumstance that it was not found after his death nor seen by any one is quite inconceivable.

The testimony was all submitted to the jury under a very fair and impartial charge, and it is quite evident that they were of opinion that the defense had no basis of truth to sustain it.

We think the verdict was justified by all the facts and probabilities of the case. The defendant went to the house of the deceased with a loaded revolver in his pocket, and the quarrelsome attitude that he assumed upon entering, according to the testimony on the part of the People, the threats to kill, the movement by which the revolver was taken from the pocket and concealed in the coat sleeve and the manner in which he used the pistol upon the deceased,

all indicated a deliberate and premeditated design to effect his death, which was carried into effect.

It is not material whether the defendant's acts, resulting as they did in the death of Salvano, under the circumstances, proceeded from some motive not disclosed, or from general depravity of mind and a reckless disregard of human life. In either case, in the absence of lawful excuse or justification, these acts establish the crime of murder in the first degree.

The judgment should be affirmed.

All concur.