# Court of Appeals.

*November*, 1888.

## PEOPLE *v.* JACKSON.

POSTPONEMENT OF TRIAL. — CHALLENGE TO ARRAY AND
PANEL OF THE JURORS.—VARIANCE OF TIME BETWEEN
INDICTMENT AND THE PROOF.—EVIDENCE.

To postpone a trial because of the absence of a witness, it must appear: first, that the party who applies for the postponement has been guilty of no neglect; second, that the witness can be had at the time to which the trial is deferred; third, that the witness is really material and appears to the court to be so.

*It seems*, that the granting of such application is within the legal discretion of the trial court.

An adjourned term of the Oyer and Terminer having been ordered to be held on a certain day, for the trial of defendant for murder, trial jurors were directed to be summoned to attend at that time. These jurors having duly attended, the court discharged all jurors who had attended and served during the four weeks' session of the court. Defendant objected to, and challenged, the array and panel of jurors, upon the ground that the discharge of the four weeks' jurors was illegal. *Held*, that this furnished no ground of challenge "to the panel of jurors" under section 361 of the Code of Criminal Procedure; that in the discretion of the court, one or all of trial jurors summoned may be excused.

A variance of one day between the time of the commission of the crime, as alleged in the indictment and as proved upon the trial, is immaterial. It is enough, that the crime was committed at some time prior to the finding of the indictment, and that it can be so understood from its allegations.

A photograph of the scene of the homicide was put in evidence with the consent of defendant. A witness, who was present when the photograph was taken, was permitted, against objection of defendant, to testify that he placed three persons at the time of the taking of the photographs in the highway to represent the

positions of the parties to the occurrence. *Held*, the reception of this evidence was not error, it being in aid of the witness' oral statement and an essential and proper explanation of the circumstances attending the taking of the picture and of the picture itself.

Defendant's counsel offered to show that the revolver with which defendant committed the crime, was carried by defendant for the reason that an assault had been made upon him by one W., who had thereafter made threats against the defendant. There was no suggestion that these threats had been brought to knowledge of defendant. *Held*, that the offer was properly rejected.

Appeal by defendant Virgil Jackson from a judgment of the Court of Oyer and Terminer of Oneida County, Hon. George N. Kennedy presiding, of April 12, 1888, entered upon a conviction of murder in the first degree.

The evidence sufficiently appears in the opinion of the Court of Appeals.

*J. T. Durham, A. D. Kneeland*, and *H. J. Kneeland*, for defendant, appellant.

I. The court should have granted the application for an order of continuance under the circumstances: 1 *Burr.* 510, 511; 1 *Chitt. Crim. Law*, 492; Ogden *v.* Payne, 5 *Cow.* 15; Hooker *v.* Rogers, 6 *Cow.* 577; People *v.* Vermilyea, 7 *Cow.* 368; People *v.* Horton, 4 *Park.* 322; 1 *Colby Crim. Law*, 308–310; Commonwealth *v.* Knapp, 9 *Pick.* 496.

II. The trial judge erred in overruling the challenge to the array and panel of jurors. It was error to discharge the regular panel of jurors because of four weeks' service and make the additional panel a sole and separate panel. The regular panel of jurors were not present, and their names were not in the box from which the names were drawn for the selection of jurors to sit in the case. The prisoner was compelled, against his objection, to select twelve men from this panel thus illegally formed. *Code Civ. Pro.*

§§ 1032–1062, 1063–1170, 3350 ; People *v.* Mallon, 3 *Lans.* 224 ; People *v.* Cummings, 3 *Park.* 342.

III. The jury was not properly constituted. *Code Crim. Pro.* §§ 359, 361, 362, subd. 1 ; People *v.* McCloskey, 5 *Park.* 308 ; People *v.* Cox, 80 *N. Y.* 500 ; *Co. on Litt.* 158 a ; 1 *Arch. Crim. Pro.* 165 and note ; People *v.* Bodine, 1 *Den.* 281 ; Mayor, etc. of New York *v.* Mason, 4 *E. D. Smith*, 142 ; 1 *Abb.* 344 ; 1 *Colby Crim. Law*, 332 ; *Laws* 1871, chap. 16, § 1 ; Pierson *v.* People, 79 *N. Y.* 428 ; People *v.* Kenny, 31 *Id.* 330 ; People *v.* Ferris, 35 *N. Y.* 129 ; People *v.* Friery, 2 *Keyes*, 424 ; People *v.* Colt, 3 *Hill*, 432 ; Colt *v.* People, 1 *Park.* 611 ; People *v.* Cummings, 3 *Id.* 343 ; People *v.* Mallon, 3 *Lans.* 224; *Code Civ. Pro.* § 1171 ; McCloskey *v.* People, 5 *Park.* 308 ; Stokes *v.* People, 53 *N. Y.* 165 ; Greene *v.* White, 37 *Id.* 405 ; People *v.* Wiley, 3 *Hill*, 194 ; Anderson *v.* Rome, W. &c. Ry. Co., 54 *N. Y.* 334; Worrall *v.* Parmelee, 1 *Id.* 519 ; Hathaway *v.* Helmer, 25 *Barb.* 29 ; Freeman *v.* People, 4 *Den.* 10 ; Shields *v.* Niag. Sav. Bank, 3 *Hun*, 477 ; People *v.* Casey, 96 *N. Y.* 116 ; Nickerson *v.* Ruger, 76 *Id.* 279–283.

IV. Under the variance in the indictment and the proof in regard to time, the conviction was erroneous. The indictment does not use the words " on or before " or " on or about " or " prior to," or any similar expression, but its phraseology is " on the 30th day of January, 1888." The proof did not correspond, and the mistake was not cured by amendment. The necessary averments in an indictment for murder are material. 1 *Bish. Cr. Pro.* §§ 386–389 ; 4 *N. Y. Crim. Rep.* 547 ; *Id.* 593 ; *Code Crim. Proc.* § 280.

V. It is error to admit the evidence of the witness Wasmuth, that he had placed persons previous to the photograph of the scene of the homicide, to occupy the positions claimed to have been occupied by the deceased, his wife, and defendant during the struggle. It is also error to refuse to strike out such evidence. The representation was inaccurate ; the exactness of the position of the figures was

not shown. Portraits of individuals, pictures of localities, and representations of all kinds, are never admissible in evidence, unless authentic, truthful likenesses or resemblances. People *v.* Ruloff, 45 *N. Y.* 213 ; Hynes *v.* Mc-Dermott, 82 *Id.* 42 ; People *v.* Cowley, 83 *Id.* 465 ; 76 *Pa. St.* 340. Even if generally correct, the representation expressed the opinion of Wasmuth, and instituted improper comparison on his part. This evidence was very prejudicial to the defendant. It showed no struggle took place. The reception of it was error, if it might 'have affected the result. Morehouse *v.* Mathews, 2 *N. Y.* 514 ; Stokes *v.* People, 53 *Id.* 165 ; Holcomb *v.* Holcomb, 20 *Hun,* 156, 166 ; Carroll *v.* Deimel, 95 *N. Y.* 252 ; Hutchins *v.* Hutchins, 98 *Id.* 56.

VI. It was error to exclude the evidence to show that one Wing had had trouble with the defendant, and had made threats against his life, and that defendant had armed himself through fear of Wing's threatened assaults. This testimony bore upon the question of intent, deliberation and premediation. 2 *Colby Crim. Law,* 183, 194. A party in an action, when intent is material, may even testify directly in regard thereto. Thurston *v.* Cornell, 38 *N. Y.* 281 ; Cortland Co. *v.* Herkimer Co., 44 *N. Y.* 22 ; Seymour *v.* Wilson, 14 *Id.* 567 ; Brown *v.* Champlin, 66 *Id.* 221. And that which tends to qualify or explain the facts and acts established by the prosecution cannot be ignored. Klein *v.* People, 31 *N. Y.* 230 ; 3 *Lawson on Presumptions,* 427 ; 1 *Greenl. Ev.* part 1, chap. 4, § 34.

VII. The defendant should have been discharged when the people rested their case, because the facts proved did not constitute murder in the first degree. Deliberation and premeditation were both wanting. The court should not have submitted to the jury a question which there is no evidence to support. People *v.* Schuyler, 106 *N. Y.* 303 ; People *v.* Bennett, 49 *Id.* 137.

*Thomas S. Jones,* district attorney, for people, respondent.

DANFORTH, J.—The matters to be determined relate to the rulings of the court upon questions raised by defendant's counsel before the commencement of the trial and during its progress.

The first was on an application to the court, made March 19, for a postponement of the trial to the November term. It was refused. The court had power to grant the application, but the affidavits presented, apart from the absence of a witness, showed nothing more than that the private and personal convenience of the defendant or his counsel would be promoted by the delay asked, and the judge might well conclude that a failure to proceed would be inconsistent with the due course of public justice. So far as the application depended on the absence of a witness, the case of King *v.* D'Eon, 1 *W. Bl.* 510, is in point. Upon a like application, Lord MANSFIELD said: " To put off a trial it must appear (1) that the witness is really material, and appears to the court to be so; (2) that the party who applies has been guilty of no neglect; (3) that the witness can be had at the time to which the trial is deferred; and I believe that nothing less than these concurring facts has at any time been held to be sufficient." In the, case before us the prisoner met none of the conditions. His affidavit only averred " that there are two witnesses, ladies by the name of Harrington, who are material witnesses for deponent, without the benefit of whose testimony deponent cannot safely proceed to the trial of said indictment, as he is advised by his said counsel, after fully and fairly stating to him what he expects to prove by said witnesses, and as deponent verily believes; that neither their names nor addresses nor residences can be learned, and he cannot procure their attendance at this term of court." The affidavit of his attorney is " that deponent was informed by several persons, and, among others, witnesses who were sworn before the grand jury, that there was and is a person who was an eye-witness to the transaction, or alleged crime, with which defendant stands charged, who ran away as soon as the shooting concluded,

whose name is unknown, and whose residence is unknown, and who has not divulged his secret, so that neither what he saw, his name or residence can be learned; that such is the current rumor about the village where the alleged murder occurred;" adding that in his opinion the "evidence of such witness is very material and essential to the defendant." The question as presented hardly calls for the exercise of any legal discretion. It seems destitute of merit, and not the proper subject of review upon appeal, but in view of the importance of the case we have considered it. The trial judge did not err in his decision.

Second. It is claimed that "the trial judge erred in overruling the challenge to the array and panel of jurors." It was alleged that the offense charged upon the defendant was committed in the town of Augusta, Oneida County, on January 30, 1888. He was at once arrested, and at the Oneida Oyer and Terminer, commencing March 12, 1888, indicted for murder. He was arraigned on March 15. He pleaded "Not guilty," and, his motion to postpone being denied, the trial was set down for April 9. The court ordered an adjourned term of the Oyer and Terminer to be held on that day, and directed 125 trial jurors to be summoned to attend at that time. These were drawn and summoned in the usual manner, and the court, because of their service, discharged from further attendance all jurors of the original panel who had attended and served during the four weeks' session of the court. The district attorney moved the trial of the defendant, and his counsel "objected to and challenged the array and the panel of jurors," upon various grounds, all of which, however, save one, were afterwards abandoned; the prisoner's counsel stating "that his challenge was directed to and intended to raise the question as to the legality of the discharge by the court of the jury originally summoned for the Circuit and Oyer and Terminer, and which it was admitted in open court were, after a four weeks' session and service, discharged for the term, and this present panel summoned in its stead."

The Code of Criminal Procedure permits a challenge to the panel (section 361), but provides that " it can be founded only on a material departure, to the prejudice of the defendant, from the forms prescribed by the Code of Civil Procedure in respect to the drawing and return of the jury, or on an intentional omission of the sheriff to summon one or more of the jurors drawn." The objection now relied upon indicates no error. The dismissal of the regular panel, if erroneous, is not within the section cited. That, by explicit language, is confined to acts of omission from a prescribed procedure. In the Oyer and Terminer the trial jury is formed as prescribed in the Code of Civil Procedure (*Code Crim. Proc.* § 358); and for that court, whether held by original appointment or adjournment, any number of trial jurors may be summoned by direction of the court, and whensoever it deems necessary. *Id.* §§ 34, 1058. So, also, in the discretion of the court, a juror may be excused ; and as one may be, so may all. Section 1033. Continued service by a juror for four weeks might reasonably lead the trial court to the conclusion that public interest, as well as that of the juror, required a change or permitted his relief.

Third. The indictment charged that the crime was committed on the 30th day of January. The evidence showed that it was in fact committed on the 29th of January. The variance was unimportant, and properly disregarded. It is enough that the crime was committed at some time prior to the finding of the indictment, and that it could be so understood from its allegations. *Code Crim. Proc.* §§ 280, 284, subd. 5. The indictment might, indeed, have been amended (*Id.* §§ 293–295), but that was not necessary for the preservation of any right of the defendant.

Fourth. That the court erred in the admission of evidence.

(1) A photograph had been put in evidence, not only without objection from the defendant, but with his consent, to show the place where the homicide was committed. It represented a street scene, and, among other houses, the one

occupied by the deceased in his life-time. Wasmuth, whose
testimony is hereinafter referred to, from his own window
had seen part of the affair, and the situation of the parties.
He was present when the photograph was taken, and placed
three persons in the highway to represent the position which,
according to his recollection, they occupied at the time in
question. His testimony as to that fact was objected to,
and its admission is assigned as error. The arrangement was
not exact, but it was matter of description, and served to
indicate in a general way the impression left upon the mind
of the witness. It aided his oral statement, and was an es-
sential and proper explanation of the circumstances attend-
ing the taking of the picture and of the picture itself.

(2) The defendant visited the wife of Metcalf the night
before the shooting, and remained in her bed-room for
several hours. He was there, as on many former occasions
he had been, for an illicit purpose ; and evidence was given
that the overcoat worn that night contained a stocking with
a stone in it, described by the defendant as a " slung-shot."
It is now made a point that the defendant was not permitted
to show why he carried it. This, if well founded, might
present a serious question, but we have carefully examined
the record, especially at the folios referred to by the defend-
ant, and find no evidence of such exclusion.

Fifth. That evidence was improperly excluded.

The shooting was from a revolver ; and the defendant's
counsel, in answering the plaintiff's case, said : " I desire to
show, if the court please, that Mr. Frederick Wing assaulted
the defendant about July last, in the saloon of Edward Was-
muth, in the village of Augusta Centre ; that there they
had a quarrel, Wing and the defendant, and that Wing
threatened the defendant's life. I shall produce an array of
witnesses to show that Wing threatened the defendant's life,
and has repeatedly since. That the defendant carried the
revolver which he had on his person to guard against a
threatened assault by Frederick Wing. As bearing upon
the question of premeditation and deliberation in the carry-

ing of this revolver, I desire to show the fact in reference to that assault and of his threats; to show that one of those threats was made about a week before this homicide. I shall show that he purchased his revolver after that fracas," —and the trial judge replied : " I do not think the evidence is admissible at this stage of the case, but I will allow you to proceed for the present on the line of the examination which you offer." The defendant's counsel thereupon gave evidence, by one witness, of threats made by Wing to Jackson, and offered another to testify that he had heard from Wing similar threats; but there was no suggestion that they had come to the defendant's knowledge. Without that, they were unimportant, for, if not communicated to the defendant, they could have had no influence upon his conduct. It was no doubt competent for the defendant to explain the possession and carrying of the revolver, and he was not prevented by the court from doing so. But, although a witness in his own behalf, he gave no explanation of that fact until on cross-examination he was asked by the district attorney as to the occasion, and he explained that a week before the homicide he had taken the revolver from his drawer, and put it in the pocket of his " best pants," to take with him to his mill, to see if he " could shoot a rat;" and on the day in question he put on " the same pants," the revolver still remaining in the pocket. He made no mention of Wing, or apprehension of danger from any source.

Sixth. That there is no evidence of premeditation or deliberation. To us it seems otherwise. That Metcalf was killed by the defendant is not denied; that the killing was effected by one or more of three bullets discharged from the revolver into his body, is proven; and that, before these three, one other bullet had been discharged without effect Metcalf was unarmed, and ill to such a degree as to require and have the care of a physician before and even on the very day of his death. How the defendant and Metcalf met, and what, beyond the shooting, occurred at the meeting, is partly in evidence, and partly in inference. The direct evi-

dence, except as it comes from the defendant, is absent at a most interesting stage of the transaction. The parties had been friends, but about a year before the homicide the defendant had formed such relations with Metcalf's wife as permitted him to visit her at his pleasure in her bed-chamber at night, and remain usually until 1 o'clock the next morning. There is no suggestion that Metcalf connived at this. There is some that he had been informed of intimacy between them. He occupied a room apart from his wife, but in the same house. During the last year he refused to speak to the defendant, and the latter had been informed by Mrs. Metcalf that her husband did not wish him to come to the house, or pay any attention to her or his family. So far as appears, the defendant and Metcalf had after that no intercourse, and the defendant's visits to Mrs. Metcalf were made in the absence of her husband from home, or late at night. On the night of January 28, the defendant went to Mrs. Metcalf, and remained with her until after midnight. At that time he had with him, as he says, the " slung-shot," already referred to. They had planned an elopement, and on leaving her room the defendant took with him some of her clothing ; other portions he had before taken. The next day was Sunday (the 29th), and the defendant about noon went into the neighborhood of Metcalf's house, and remained at different places in the vicinity, and in sight of it, until 2 o'clock, when Mrs. Metcalf left her house, and the defendant at once followed her. She went to church, and so did he. It was not usual with her to do so, and with him it was the first time. At the close of service they met, and walked together along the highway towards Metcalf's house, and, when about opposite his gate, Metcalf was seen coming from it, walking at a moderate pace. The defendant's statement of the occurrence is as follows : " I was walking down from the Episcopal church with Mrs. Metcalf, and, as we came down nearly opposite from Mr. Metcalf's house, he came out of the door, and began swearing at me, and calling me names. Says he, ' You went up to the church on

purpose to walk down with my wife, did you not?' I denied it. Says he, 'If you think so much of her, why don't you take her, and take care of her?' I told him I didn't mean any harm in walking down with her, and I didn't see why he wanted to come out and make such a fuss about it for. I told him I didn't want any disturbance on Sunday. He stepped in front of me. I tried to pass along. Says I, 'I wish you would let me pass.' Says he, 'God damn you, I will kill you.' At that he struck at me. I stepped back a step or two. He staggered me a little. Then he clinched me by the throat, and in the scuffle we got turned around, and he got his hand over my throat, and was choking me. He was on the upper hillside then. He pulled me down, or I slipped down on my knee, and I felt—I was afraid—that he would throw me over on my back, and I thought with the passion he was in he would do as he said. I drew my revolver. He had me by the throat, as I said; and I doubled my head down to keep his thumb from pressing my throat. I did not take any aim when I drew my revolver. He was trying to get his other hand hold of my throat. As I fired I threw my hand up. I don't remember of firing but twice. It seems I did shoot three times. Then I struggled to regain my feet, and got part way up. I knocked his left hand away that he was trying to get hold of my throat with, and he changed his other hand, and got hold of my coat, and run his knuckles up in that shape, and threw my head over. At that instant I threw my hand up and fired. That was the last shot. Immediately he began to sink down gradually, and I looked at him, and I thought he was fainting. I didn't know that he was mortally wounded. He settled down right in front of me; close to me; right at my feet. Mrs. Metcalf started to go down and call Mr. Williams; at least I suppose that was the object. She turned to me, and she says, 'I wish you would go and call him.' I went down to the door, and told Mr. Williams I had shot Nort, and I wished he would come out and help get him in the house."

Did this actually occur ?   Did Metcalf press the defend-
ant, impede his passage, and strike him ?   Did the. defend-
ant attempt to escape from his attack ?   Was the assault so
sudden and violent, and the danger so imminent, that no
time was left for escape ?   There is no pretense that Met-
calf was armed, or that the defendant thought he was armed.
On cross-examination the defendant said Metcalf had nothing
in his hand, and that he did not at the time believe that
Metcalf intended to kill him.     Were these things as re-
lated by defendant?   Did he go to church for any other
purpose than to walk home with Metcalf's wife, and did he
do so to incite Metcalf, and remain with her in order to
carry out with deliberation a design already formed ; and
did he kill Metcalf, after premeditation, and intentionally,
in pursuance of that design, and not in the preservation of
his own life, or in the heat of blood ?   It was for the jury
to say.   They were not bound to believe the defendant's
story, even in the absence of other evidence.   But there was
a witness to a part of the occurrence.   One Wasmuth, a
store-keeper and housekeeper in the village, living next to
Metcalf's, knew both parties.   On the day in question he
was at home.   His attention was attracted by pistol reports.
He went to the window, and in plain sight saw the defend-
ant, Mrs. Metcalf, and Mr. Metcalf.   He describes their
position.   He says both were standing, a little space between
them.   Neither had his hands upon the other.   Metcalf was
two or three steps from Jackson, his left side towards him,
his head over his shoulder, and he looking at Jackson.   His
arms were by his side.   As the witness got to the window
he heard another report, and saw the flash of the pistol
from Jackson's right hand.   His left hand was by his side.
Metcalf took three steps, his head dropped on his breast, and
he fell to the ground motionless.   The witness was looking
at them, and saw no demonstration on the part of Metcalf
towards Jackson.   This was the last shot.   He went at once
to the spot and saw no indications of any struggle in the
snow, nor marks on Jackson's face, nor on his neck.

There are other circumstances, enough in some reason able view, to satisfy the jury that there was no mutual combat, and that the aggression and violence were altogether on the part of the defendant in carrying out a deliberate design to kill. He had provided means necessary for its effectual perpetration. He had owned the revolver, a five-shooter, for some months,—since the preceding August. He had habitually kept it in a table-drawer in a room occupied by himself and another person. On this day he took it with him. Was it by accident or for a purpose? He knew of Metcalf's objections to any attentions on his part to Mrs. Metcalf. As his visits before had been in the dark, so as to avoid the husband, did he on this occasion, in open day, in her company, solicit his observation, hoping thus to sting and provoke him to an altercation, himself ready with a deadly weapon to determine the result, and so remove the only obstacle to his unchallenged possession of the woman he had debauched, and whom he still coveted? But if the defendant, smarting under the provocation, and affrighted by the attack of the husband, did for a moment lose his own understanding, was there not time for reason to resume its seat before the mortal wound was given? He was a larger and stronger man than his assailant. His escape by flight was unimpeded. His pistol was in his hip pocket, over it an undercoat, upon that an overcoat, yet he contrived, and without a serious attempt either at flight or effectual resistance, where both were possible, to overcome the obstacles presented by his clothing, and possess himself of the weapon. A jury might fairly say, not only that the pistol was with him as a mode of preparation, but that in the manner of possessing himself of it when its use was desirable in the perpetration of his design there was manifested such exercise of thought and contrivance as denoted the presence of judgment and reason, rather than the violent and ungovernable passion, either of fear or anger. They have, indeed, said by their verdict that the circumstances of the case and the creditable evidence point with irresistible force to a

crime, committed intentionally, and with premeditation and deliberation.

Some other exceptions were taken by the learned counsel for the defendant. They are unimportant. No right of the defendant was prejudiced by any ruling during the trial. We find no misdirection on the part of the judge, nor any reason to doubt that the verdict was reached after a fair and full consideration of the case by the jury. We think that it reflects the very truth of the issue, and justice requires that it should be made effective.

The judgment and conviction, therefore, should be affirmed.

All concur, except GRAY, J., not voting.