## Court of Appeals.

*January*, 1891.

## PEOPLE *v.* FISH.

*Homicide—intoxication, motive and intent—expert testimony—photographs as evidence—constitutional law. Penal Code, §§ 22, 528; Code of Criminal Procedure, §§ 219, 220.*

Intoxication is no excuse for crime (*Penal Code*, § 22). And its only materiality is upon the question of deliberation, premeditation, and intent. Hence, if while intoxicated, a defendant had sufficient mental capacity to deliberate and premeditate the criminal act which he intentionally committed, he is guilty to the same extent as if he had been perfectly sober at the time of the commission of the offence.

The power given to the court of appeals by § 528 of the Penal Code to order a new trial, whether any exceptions were taken or not in the court below, if it be satisfied that the verdict was against the weight of evidence or law, or that justice requires a new trial, does not confer upon the court an arbitrary power to grant

a new trial whenever it thinks that justice may require it. Its jurisdiction in such a case is to be exercised according to settled rules of law.

Whether or not there is sufficient preliminary proof that a witness whose testimony has been taken upon the preliminary examination cannot with due diligence be found within the State, to permit the prosecution to read upon the trial his testimony taken at such preliminary examination, is a question addressed to the discretion of the trial court, and such discretion should not be lightly interfered with.

An objection that the preliminary proof of the absence of a witness was not sufficient to justify the reading upon the trial of his deposition taken at a preliminary examination is not available for the first time on appeal.

The intent with which a crime was committed need not be shown by direct evidence, but may be proved by the circumstances attending the act; what was said and done on the occasion by defendant, his conduct afterwards, and, in a crime committed by violence, the character of the instrument used, and the nature and force of the blow, may be considered by the jury in determing the intent with which the blow was struck.

Where a defendant, while in the possession of his faculties sufficiently to conceive a design, voluntarily and wilfully did an act which had a direct tendency to destroy another's life, the jury may presume from that fact that he intended the natural consequences of his act. This presumption, however, is one of fact and not law.

Whatever is done with premediation and deliberation must be done intentionally; hence it follows that if the jury find that the defendant did in fact commit the act with which he is charged in such manner and under such circumstances as to show deliberation, the presumption then arises that he intended to commit the crime, and the jury may be so charged as a matter of law.

It is not incumbent upon the prosecution to prove motive as distinguished from intent.

The amount of force necessary to drive a blunt instrument through the tissues, muscles, arteries, and windpipe, and into the vertebræ of a human body is not a matter of common knowledge, but depends upon experience which the physician and surgeon acquires in dissecting and cutting into the human body, and renders him an expert in regard to such matters.

A question to the magistrate before whom the prisoner was brought soon after the commission of the homicide: "On this occasion

from what you observed of Fish when you brought him out there, do you believe he was in the condition in which he comprehended the situation and what was transpiring there fully?" is improper, as being addressed to a person not an expert, calling for his opinion and not for facts.

Photographs of a place where a homicide was committed, as well as of the victim's head and neck, showing the wounds received by him, are competent evidence.

The reading upon the trial of a deposition taken on a preliminary examination of a witness whom it was satisfactorily proved at the trial the prosecution was unable to find with due diligence, is not a violation of Art. 6 of the United States Constitution giving to a defendant the right to be confronted with the witnesses against him, because the provisions only refer to prosecutions in the United States courts, and it never was one of the privileges of a citizen of the United States to be confronted with the witnesses against him in a State court. Nor does it conflict with the provision of the fourteenth amendment of that constitution forbidding any State to abridge the privileges or immunities of the citizens of the United States, or to deprive any person of life, liberty, or property without due process of law, or to deny any person the equal protection of the law.

The provisions of the Code of Criminal Procedure (§ 8, subd. 3) in relation to reading depositions at trials present no constitutional question under the laws of this State because the New York Bill of Rights, which contains an expression of the same principle, that the accused has the right to be confronted with the witnesses against him, is a mere statutory enactment which can be repealed or altered by the legislature; which it has done by the enactment of § 8, subd. 3, of the Code of Criminal Procedure.

Appeal by defendant Frank Fish, from a judgment of the court of oyer and terminer of the county of Canandaigua, entered upon the verdict of a jury convicting him of murder in the first degree.

The facts sufficiently appear in the opinion of the court.

*Oliver C. Armstrong*, for defendant appellant.

*Maynard N. Clement* (district attorney), for the people respondent.

EARL, J.—The defendant was convicted of murder in the first degree on the 24th day of May, 1890, for killing John Cullinane on the prior 26th day of January, at Canandaigua, in this state. There is no substantial dispute about the facts of the case. The defendant at the time of the homicide was about 24 years old, 5 feet 5 inches in height, weighed about 140 pounds, and was a painter by occupation. Cullinane was a moulder, over six feet in height, weighed about 190 pounds, and was about thirty years old, and they were both married and householders. The 25th of January was Saturday; and about six o'clock in the evening the defendant and his brother, John E. Fish, and Cullinane, quit work, and each went to his home. A few moments before 9 o'clock John E. Fish and Cullinane went to a saloon kept by Ryan, where they were soon joined by James Cullinane, a brother of John. The defendant left his home about 8 o'clock, and about 9 o'clock he met two young men, who had with them a pint of whiskey, and they invited him to share it with them. They each drank out of the bottle, and then the defendant drank about a tea-cup full, the balance remaining therein. Soon thereafter he also went to Ryan's saloon, and he and his brother and the two Cullinanes remained there, talking on various subjects, and drinking beer together, until nearly a quarter to 12 o'clock. While in Ryan's saloon the defendant offered to shake hands with John Cullinane on two different occasions, and Cullinane declined to take his hand. About 12 o'clock Cullinane and the defendant and his brother left Ryan's saloon, and went to a saloon kept by Charles McCarthy, and there they drank some beer, and the defendant and the deceased danced, and after remaining there about fifteen minutes the three persons left the saloon together, and proceeded down the street to a barber-shop, and while going down, the defendant stated to his brother that he would go and stay with him. They stopped opposite the barber-shop, and John E. Fish asked his companions to go in while he had his hair cut. Cullinane declined, saying he thought

he would go home, and John E. Fish shook hands with them, and bade him good night. The defendant then offered to shake hands with Cullinane, and he drew his hand away. Then the defendant asked him if he ever did anything to him. He replied that he had not. The defendant then said to his brother, John E. Fish: "All right; you are a brother of mine. That settles you and me." John Fish replied: "All right. You go to hell." The defendant then started up street, and Cullinane started to follow him, and went 10 or 15 feet up the walk in the direction the defendant was going, and then turned and came back in front of the barber-shop, and stopped, and he said in a low tone, evidently inaudible to the defendant; "The son of a bitch." The defendant, after going about 30 feet, came back, walking rapidly down the street, with both hands in his overcoat pockets, and as he came opposite the deceased he drew his right hand from his pocket, turned towards the deceased, and dealt him a blow on the right side of the neck, saying at the time; "Take that," and then ran down the street in the direction of his home. The instrument with which he struck the blow was a narrow iron blade used for opening cigar-boxes. It was not sharp, and was not made for the purpose of cutting anything, but merely for the purpose of prying off the covers of cigar-boxes. The blow was dealt upon the neck a little below the jaw, and the instrument penetrated about four inches in depth, passing through the larynx, and into the hard bone of the *vertebræ* more than half of an inch. From the wound thus inflicted, Cullinane very soon died. The defendant, after striking the blow, went directly to his home, and soon thereafter undressed and went to bed. Within an hour after the fatal blow had been dealt officers went to his house and arrested him. He was at once taken before a police magistrate, and there he appeared, to some extent, to be unconscious that he had committed the homicide. All the witnesses who saw him shortly before and after the homicide testified that he was somewhat intoxi-

cated.  He was able, however, a few minutes before, to
dance in McCarthy's saloon, and he was sober enough to run
away, go home, undress, and go to bed immediately after
striking the fatal blow.  After his arrest his conversation
showed that he was aware, at least, that he had committed
some wrongful act.  It does not appear that the defendant
and the deceased were, prior to the evening in question, at
all intimate or familiar with each other.  There is no evi-
dence showing what their relations were, and it does not
appear that there was any animosity between them, and no
explanation was given on the trial showing why the deceased
refused the proffered hand of the defendant on the three
occasions when it was offered.

The learned counsel for the defendant claims that upon
this evidence the defendant ought not to have been con-
victed of murder, but that he should have been convicted
only of manslaughter, and he claims that we should grant a
new trial to the defendant, under section 528 of the Code
of Criminal Procedure, which authorizes this court, when
the judgment is of death, to order a new trial, " if it be sat-
isfied that the verdict was against the weight of evidence,
or against law, or that justice requires a new trial, whether
any exception shall have been taken or not in the court
below."  This section has been under consideration in this
court several times (People v. Driscoll, 107 *N. Y.* 417;
People v. Cignarale, 110 *N. Y.* 23; 6 *N. Y. Crim. Rep.*
82; People v. Lyons, 110 *N. Y.* 618; 6 *N. Y. Crim. Rep.*
105; People v. Kelly, 113 *N. Y.* 647; 7 *N. Y. Crim.
Rep.* 40; People v. Stone, 117 *N. Y.* 480; 7 *N. Y. Crim.
Rep.* 430).  It does not confer upon the court power arbi-
trarily to grant a new trial whenever it thinks justice may
require it, but its jurisdiction in such a case is to be exer-
cised according to settled rules of law.  If there is a conflict
in the evidence, or different inferences may be drawn
therefrom, it is the province of the jury to weigh the
evidence, and determine the facts; and their determination
should not be interfered with unless we can see that our

determination was against the clear weight of the evidence, or was influenced in some way by passion, prejudice, mistake, perversion, or corruption. In the case of People v. Cignarale (*supra*), ANDREWS, J., said : " It is a cardinal principle in our jurisprudence that the jury is the ultimate tribunal for the investigation and determination of questions of fact. It is no more the province of an appellate court, than of the court of original instance to determine controverted questions of fact arising upon conflicting evidence. Neither can lawfully usurp the appropriate function of the jury, and neither can substitute its own judgment for that of the jury, where the facts are reasonably capable of diverse or opposing inferences." The people were bound to show that the defendant intentionally killed Cullinane, with premeditation and deliberation, and we think there was evidence sufficient to warrant the jury in so finding. The defendant was undoubtedly somewhat intoxicated, and was probably angered by the refusal of the deceased, a minute or two before the fatal blow was struck, to shake hands with him. It is probably true that, if he had been perfectly sober, that circumstance would not have provoked him to violence. But the motive which would have had comparatively little influence upon a sober man evidently aroused his animosity, and after he had passed down the street a short distance he returned near to where the deceased was standing, and with this dangerous instrument in his hand he spoke to his own brother, so as not to attract the attention of the deceased, and then suddenly turned, and with a swinging blow, and with great force and violence, plunged this blade into the throat of the deceased, the place where it would be most likely to produce a fatal effect. That he returned for the express purpose of inflicting the blow, cannot be doubted. That he deliberated upon his purpose while he was returning, and when he approached the de deceased and struck the blow, is equally clear. We think the inference may fairly be drawn that he then and there intended to take the life of the deceased.

The fact that the defendant was intoxicated furnishes him no excuse. Section 22 of the Penal Code provides that "no act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition; but whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute a particular species or degree of crime, the jury may take into their consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." The only materiality, therefore, of the evidence of the defendant's intoxication is its bearing upon the questions of deliberation, premeditation, and intent. If he was sober enough to form an intent and to deliberate and premeditate this crime, then his responsibility is the same as if he had been perfectly sober. In weighing the evidence as to premeditation and deliberation, the jury was bound to take into account the condition of the defendant, and they were so instructed. But if, while somewhat intoxicated, he still deliberated upon and premeditated the act which he intentionally committed, the crime is murder in the first degree.

It is claimed that the prosecution proved no motive for the crime. But it is not incumbent upon the prosecution to prove the motive of a crime in any case. It may be impossible to discover a motive hidden in the human breast, and yet the crime may be proved beyond a reasonable doubt. Here, while the motive would be deemed extremely inadequate, yet there was some motive which we must assume acted upon the mind of the defendant in inducing him to deal the fatal blow, and that was the refusal of the deceased, thrice repeated, to take his hand when extended to him for a friendly greeting.

It is further said that there was no proof of any intent on the part of the defendant to kill Cullinane. All the facts were proved. The circumstances under which the blow was dealt; what the defendant then said and did; his

conduct afterwards ; the nature and force of the blow, and the character of the instrument used,—all this evidence was before the jury, and it was for them to determine whether the defendant, in dealing this fatal blow, intended to kill.

We therefore see no reason, in the exercise of any discretion conferred upon us under section 528 of the Criminal Code, for granting a new trial, and it only remains further for us to consider the questions of law, to which our attention has been called by the defendant's counsel.

Dr. Hollenbeck, a physician and surgeon, called as a witness on behalf of the people, after testifying that he had examined the wound, and made a *post mortem* examination thereof, was asked this question : "Taking this instrument as it is now, how much force would be necessary to drive it through the tissues you have described, and into the *vertebræ?*" This was objected to on the part of the defendant, and the witness was permitted to answer as follows : "I should think it would take a great deal of force." And substantially a similar question was put to and answered by another physician. We think these questions and answers were competent. The amount of force necessary to drive such a blunt instrument through the tissues, muscles, arteries, wind-pipe and into the *vertebræ* is not a matter of common knowledge. But physicians and surgeons who have dissected and cut into the human body, are better able to tell the resisting force of those parts than other people, and are therefore experts who are competent to give opinions on the subject. But in any event, the answers were harmless, because one of the physicians answered that it would take a great deal of force, and the other answered. that it would take a very heavy blow ; and that it would is very obvious from the bluntness of the instrument and the parts through which it passed.

The district attorney presented in evidence a photograph of the place where the homicide was committed, and also a photograph of the dead man's head and neck, showing the

wound; and it is now claimed that the evidence was incompetent. It was proved that the photographs were accurately taken, and were true representations of the barbershop, and the location of the wound; and such evidence is now everywhere held to be competent (Ruloff *v.* People, 45 *N. Y.* 213; 11 *Abb. N. S.* 248; Cowley *v.* People, 83 *N. Y.* 464; People *v.* Buddensieck, 103 *N. Y.* 487; 5 *N. Y. Crim. Rep.* 69; Archer *v.* N. Y., New Haven, and Hartford R. R. Co., 106 *N. Y.* 589).

The defendant was permitted to give evidence of his intoxication, of his appearance, his acts, and all that he said before and after the commission of the homicide, and his witnesses were permitted to give their opinions as to his condition. Among the questions asked by his counsel was this, put to the police justice before whom the prisoner was brought soon after the homicide: "On this occasion, from what you observed of Fish when you brought him out there, do you believe he was in the condition in which he comprehended the situation, and what was transpiring there, fully?" This question was objected to on behalf of the people, and the objection was sustained. It is now claimed that the witness should have been permitted to answer the question. The witness was not an expert. He was not asked for any fact, but for his opinion or belief. He should have testified to the facts, and then it would have been for the jury to determine whether the prisoner comprehended the situation, and what was transpiring there. The same witness was asked this question: "State how he appeared." And he answered: "He appeared a little astonished." This was objected to on behalf of the people, and stricken out. The defendant was permitted to obtain from the same witness evidence showing that the defendant was apparently astonished at the charge of murder made against him, and that he appeared to be intoxicated: and the witness was permitted to testify as to all the facts in relation to his appearance. But, whether the evidence stricken out was competent or not, it was of no importance, and had no

material bearing, and added nothing to the force of the other evidence upon the same subject. No exception was taken to the ruling of the court striking it out, and we think no harm came to the defendant from striking it out.

Maltman, one of the important witnesses for the people, was sworn upon the preliminary examination before the police justice. The defendant was there with counsel, who cross-examined the witness. The examination of the witness was reduced to writing, read over to him, subscribed by him, and properly certified. The witness was subpœnaed to attend the trial, and, not appearing, the district attorney, against the objection of the defendant's counsel, was permitted to read the deposition in evidence. He claimed the right to read it under subdivision 3 of section 8 of the Code of Criminal Procedure, which provides that the defendant in a criminal action is entitled " (3) to produce witnesses in his behalf, and to be confronted with the witnesses against him in the presence of the court, except that where the charge had been preliminarily examined before a magistrate, and the testimony reduced by him to the form of a deposition, in the presence of the defendant, who has, either in person or by counsel, cross-examined, or had an opportunity to cross-examine, the witness; or where the testimony of a witness on the part of the people has been taken according to sections 219 and 220, the deposition of the witness may be read, upon it being satisfactorily shown to the court that he is dead or insane, or cannot with due diligence be found in the state." It is now objected that it was not satisfactorily shown to the court that the witness was dead or insane, or could not with due diligence be found within the state. The trial of the defendant commenced on the 19th of May, 1890, and resulted in his con-viction on the 24th day of the same month. Prior to that, and on the 24th day of April, the district attorney delivered to the under-sheriff of the county a subpœna to serve upon Maltman, and on the 25th day of April he served it upon him in the village of Canandaigua, at the place where he

was then working. Some days after the service of the
subpœna, the under-sheriff met the witness in the streets of
Canandaigua, and told him that he had been subpœnaed,
and that he would expect him to be present in court. He
said that the week before court convened he wanted to go
to the home of his sister, who lived about two and a half
miles from the village, and that on Monday morning, the
19th of May, he would be at court. On the 19th, and also
on the 20th, his name was called in court by the crier, and
he did not answer. Monday morning the under-sheriff
made inquiries of his relatives and other people, and, not
being able to learn anything about him, on Tuesday he
drove to the residence of his sister, where he said he was
going, but did not find him, and could not learn anything
of his whereabouts. Further inquiry was made, but the
officer was not able to learn anything about him, or to find
him. Upon this evidence the court held that the dis-
trict attorney had established *prima facie* that due diligence
had been exercised by the district attorney to find the wit-
ness, and that he could not be found. No exception was
taken to the ruling of the court, and no claim was made at the
trial that the preliminary proof was not sufficient to author-
ize the reading of the deposition. It is quite true that the
preliminary proof was not very satisfactory, and that the
diligence used to find the witness and procure his attend-
ance was not very great ; and yet it is difficult to see what
more the under-sheriff could have done to procure his at-
tendance. It does not appear that the officer had any reason
to suppose that the witness was at any other place than those
where he had inquired for him, or that any diligence which
he could use would discover him. It is quite a valuable
right to a prisoner to be confronted upon his trial with the
witnesses against him, so that he may cross-examine them,
and the jury see them, and thus judge of their credibility,
and he should not be deprived of this right without a strict
compliance with the statute. But the preliminary proof is
addressed to the trial court, and, if based upon evidence

legitimately tending to establish the facts required by the Code referred to, his decision should not be lightly interfered with. But here it was tacitly assented by the defendant's counsel that the proof was sufficient, and he made no objection on that ground. If he had then and there made such objection and required further proof, it is possible that the district attorney might and would have furnished it. We are therefore of opinion that the objection that the preliminary proof was not sufficient to authorize the reading of the deposition is not now available to the defendant.

It is further objected that the provision of the section of the Code referred to is in violation of article 6 of the amendments of the federal constitution, which provides that in all criminal prosecutions the accused shall enjoy the right to be confronted with the witnesses against him. There is no such provision in our state constitution, but under the bill of rights (1 *Rev. St.* p. 94, § 14) it was provided that in all criminal prosecutions the accused has the right to be confronted with all the witnesses against him. This was, however, a statutory enactment, and the legislature could repeal or alter it. The provision in the federal constitution, originally adopted, had reference only to prosecutions in the federal courts, and had no reference whatever to prosecutions in the state courts (Withers *v.* Buckley, 20 *How.* 84; U. S. *v.* Cruikshank, 92 *U. S.* 542; Walker *v.* Sauvient, *Id.* 90; Pearson *v.* Yewdell, 95 *U. S.* 294). But the learned counsel for the defendant claims that the sixth article has been made applicable to prosecutions in the state courts by section 1 of the fourteenth amendment of the federal constitution, which provides that " all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny any person within its jurisdiction the equal protection

of the laws." We do not think that this section has the effect claimed for it. It was never one of the privileges or immunities of a citizen of the United States to be confronted with the witnesses against him in a state court. That was a privilege secured to him by the federal constitution, and, as we have seen, was confined strictly to the federal courts. The section of the Criminal Code referred to does not attempt to interefere with any privilege or immunity which a citizen of the United States ever enjoyed under the federal constitution. All citizens, of whatever race or color, are secured the right to be confronted with their witnesses in every prosecution in the federal courts; but the states may modify that privilege in all prosecutions in state courts, provided that equal protection and due process of law be left to the citizen. But even if we are wrong in this construction of the fourteenth amendment, we think it is clearly settled by numerous adjudications that the right of the defendant to be confronted with the witnesses, within the meaning of the federal constitution and the bill of rights, was not denied to him. The evidence of the witness was taken in his presence, where he had the opportunity to cross-examine him, and where he did in fact cross-examine him; and thus he had all the protection that the bill of rights and the constitution were intended to secure him. This constitutional provision was not intended to secure to the accused person the right to be confronted with the witnesses against him upon his final trial, but to protect him against *ex parte* affidavits and depositions taken in his absence, as was frequently the practice in England at an early day. It was never regarded as an invasion of the fundamental rights of an accused person to read depositions upon his trial, if at some stage of his case he could be confronted with and cross-examine the witnesses to be used against him. In Cooley (*Const. Lim.* 5th ed. 389), the learned author, speaking of this constitutional provision, says: " If the witness was sworn before the examining magistrate, or before a coroner, and the accused had an opportunity then to cross-

examine him, or if there were a former trial on which he was sworn, it seems allowable to make use of his deposition, or of the minutes of his examination, if the witness has since deceased, or is insane, or sick and unable to testify, or has been summoned, but appears to have been kept away by the opposite party;" and for this he cites numerous authorities. This precise question was under consideration in the case of People v. Williams (35 *Hun*, 516, and 3 *N. Y. Crim. Rep.* 63), and was disposed of in accordance with these views. See also Sullivan v. Haug (46 *N. W. Rep.* 795; *Mich. Sup. Ct.* Oct. 17, 1890).

The court charged the jury, among other things, as fol. lows: "If the defendant, while in the possession of his faculties sufficiently to conceive a design, voluntarily and wilfully did an act which had a direct tendency to destroy another's life, the jury would have the right to presume from that fact that he intended the natural consequences of his own act." This portion of the charge is free from error. It is, in substance, that if the prisoner was sufficiently in possession of his faculties to form an intent, and voluntarily and wilfully did an act which had a direct tendency to destroy another's life, the jury would have the right—not that they were bound to do so—to presume that he intended the natural consequences of his act; and this, we believe, is a correct statement of the law. It is quite true that the prosecution is bound to prove all the facts constituting the crime with which the prisoner is charged, and that the burden rests upon the people, from the beginning to the end of the trial, to establish beyond a reasonable doubt every fact essential to the conviction of the defendant; but this rule was not violated by the charge referred to. The jury were bound to find that the defendant was capable of forming an intent, and that he did form the intent, and that he wilfully and voluntarily dealt the blow; and they were permitted to infer or presume from these facts that he intended the fatal blow which he inflicted. The court did not lay down the rule that they were bound,

as matter of law, to presume it, or that the law implied that the defendant intended the natural consequences of his act. Therefore the rules laid down in Stokes v. People (53 *N. Y.* 164), People v. Baker (96 *N. Y.* 340), People v. Conroy (97 *N. Y.* 62), were not violated. In York's Case (9 *Metc. Mass.* 103), Chief Justice SHAW said : "A sane man, a voluntary agent, acting upon motives, must be presumed to contemplate and intend the necessary, natural, and probable consequences of his own acts. If, therefore, one voluntarily or wilfully does an act which has a direct tendency to destroy another's life, the natural and necessary conclusion from the act is that he intended so to destroy such person's life. So, if the direct tendency of the wilful act is to do another some great bodily harm, and death in fact follows as a natural and probable consequence of the act, it is presumed that he intended such consequence, and he must stand legally responsible for it. So, where a dangerous and deadly weapon is used with violence upon the person of another, as this has a direct tendency to destroy life, or do some great bodily harm to the person assailed, the intention to take life, or do him great bodily harm, is a necessary conclusion from the act."

It is also claimed that the following portion of the charge of the judge is erroneous : "Before coming to consider more directly the question of premeditation and deliberation, it is perhaps desirable, as leading up to that consideration, that we examine one or two other points which present themselves. Was there any design on the part of the defendant to kill this man, John Cullinane, and does the evidence in the case furnish any motive for such design on his part? It has been said, and very properly, in your hearing, that where a man, who is in possession of his faculties, deliberately takes the life of another, the law presumes that he intended the natural consequences of his act ; and therefore, if you find that the defendant did take the life of John Cullinane in such a manner, and under such circumstances as to show deliberation, the presumption arises at

once that he intended to take his life as he did. The law raises that presumption against the defendant, provided you shall find that he was in the possession of his faculties, and that he took the life of John Cullinane with premeditation and deliberation." This portion of the charge involves the self-evident proposition that if the defendant, with premeditation and deliberation, took the life of Cullinane, he intended to take it. That, so far as we can see, must be universally true of all the acts of an intelligent person. Whatever is done with premeditation and deliberation must be done intentionally.

Other portions of the charge were objected to, and several requests to charge, made on behalf of the defendant, were refused. We have carefully examined the whole charge as given, and all the requests refused, and we think no error was committed by the learned judge. His charge was eminently fair and just to the defendant, and fully and fairly instructed the jury; so that there could have been no misconception as to the law governing the case.

A careful consideration of the whole case has constrained us to believe that no error was committed at the trial to the prejudice of the defendant. We think all the elements constituting the crime of murder in the first degree were proved by uncontradicted evidence. The crime was undoubtedly committed, like many others, under the influence of intoxicating liquor, but for which the deadly blow would not have been dealt. We sit here to administer and to uphold and enforce the principles of law and justice applicable to the cases presented to us, uninfluenced by sentiments of commiseration or of mercy. It may be that, if we had jurisdiction to listen to an appeal for mercy, we would relieve the defendant from the extreme penalty of the law; but such relief can be given only by the governor of the state, to whom, very properly, under the circumstances of this case, an application can be made. It remains for us only to affirm the judgment of conviction. All concur.

NOTE.—As to use of photographs, see Cozzens *v.* Higgins (1 *Abb. Apps. Dec.* 451); Chestnut Hill, etc., Co. *v.* Piper, etc., Co. (15 *Wkly. Notes,* 55); Duffin *v.* People (107 *Ill.* 113); People *v.* Jackson (6 *N. Y. Crim. Rep.* 393); Ebom *v.* Zimpelman (47 *Tex.* 503; 26 *Am. Rep.* 315 [and extended note 319-321]); Dyson *v.* N. Y. & New England R. R. Co. (57 *Conn.* 9; 14 *Am. St. Rep.* 82); Brown *v.* Metropolitan Life Ins. Co. (65 *Mich.* 306; 8 *Am. St. Rep.* 894); Alberti *v.* N. Y., L. E. & W. R. R. Co. (118 *N. Y.* 77); People *v.* Smith, 121 *N. Y.* 587. As to copies from original photograph, see Wilcox *v.* Wilcox (46 *Hun,* 32).