THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MARTIN D. LOPPY, Appellant.

*Court of Appeals, October 6, 1891.*

1. *Appeal. Facts.*—In reviewing the evidence of a criminal case on an appeal directly to the court of appeals, this court is governed by the practice regulating appeals to the supreme court in dealing with questions of fact.
2. *Same.*—Unless there are circumstances indicating some partiality, mistake, error or prejudice on the part of the jury, their findings on disputed and conflicting evidence must be regarded as conclusive.
3. *Same.*—A review of the evidence in this case was held to lead to the conviction that the jury made no mistake in their verdict.

Appeal from judgment of the New York general sessions convicting defendant of the crime of murder in the first degree.

*Wm. F. Howe*, for appellant.

*McKenzie Semple*, assistant district attorney, for respondent.

RUGER, Ch. J.—This case is an illustration of the general character of the appeals taken in capital cases, under the recent statute (Chap. 493, Laws of 1887) authorizing appeals directly from the trial to this court. This statute makes the formality of filing and serving a notice of appeal operative as a stay of proceedings on the judgment of conviction, and imposes upon the county where the conviction was had the labor and expense of preparing and printing the record for a review, without regard to the question whether any errors were committed on the trial or not. Thus, without any risk, expense or burden on his part, a convicted criminal is allowed to secure a delay of many months in the execution of his sentence, and impose upon the people unnecessary expense and upon the courts the burden of examining cases generally destitute of merit. The unlimited license thus given to criminals to create delay and expense is invariably availed of, and a large majority of the appeals thus taken to this court have come to us either without exceptions, or, if any, those usually of the most trivial character. This case forms no exception to the general character of such cases. There is but one exception in the case which has been called to our attention, and that is of a frivolous and unimportant character. The main object which these appeals have, if any beyond creating delay, seems to be to see if the court can, on a review of the evidence, discover some ground, not perceptible to counsel, upon which to base a reversal of the findings of the jury on questions of fact. The rule repeatedly laid down by this court, that such questions are for the exclusive consideration of juries, seems to have had no restraint upon the freedom with which such appeals have been taken, as, indeed, there is no good reason why it should, so long as criminals, without trouble or expense to themselves, are encouraged by the law to take appeals, and thereby secure delay at all times, and a possible chance of escaping punishment for their crimes. People *v.* Wood, 123 N. Y. 632; 33 N. Y. State Rep. 589; People *v.* Jugigo, 123

N. Y. 630; 33 N. Y. State Rep. 589; People *v.* Cignarale, 110 N. Y. 23; 16 N. Y. State Rep. 155; People *v.* Kelly, 113 N. Y. 647; 22 N. Y. State Rep. 969.

This condition of the record leaves but one question open to us to examine, and that is, whether the evidence discloses any just reason why the judgment of the court below should not be enforced. In reviewing the evidence in such a case, this court has frequently laid down the rule that we shall be governed by the practice regulating appeals to the supreme court in dealing with questions of fact. This practice regards the jury as the ultimate tribunal for the investigation and determination of questions of fact and, unless there are circumstances indicating some partiality, mistake, error or prejudice on their part, to regard their findings on disputed and conflicting evidence as conclusive. People *v.* Cignarale, *supra;* People *v.* Kelly, *supra.*

A careful perusal of the evidence in this case leads us to the conviction that the jury have made no mistake in their verdict. It is not necessary to detail the evidence at length, as a reference to its leading features will indicate by irresistible inference the identity of the person charged with the commission of the crime. Loppy and his wife were living in a tenement house in Chrystie street, New York, and the crime was there committed about 2 o'clock in the afternoon of July 4, 1890. They had been married about fifteen years and constituted the whole family. They occupied two small rooms, a sitting-room and bedroom, in the fifth story of a crowded tenement. They were people of humble circumstances and supported themselves by their daily labor. The deceased was about forty years old and worked for tailors as a finisher of pantaloons; and the defendant was fifty years of age and had been employed as a fireman on tugboats in the harbor of New York; but for two years previous to the homicide had been out of work and was supported by his wife. He was dissipated, as well as idle, and had no means of obtaining the money necessary to enable him to indulge

his vices, except from his wife. As might be expected, she was not at all times able to supply his wants and he then became ugly, abusive and violent. He frequently quarreled with his wife and often threatened to kill her.

On the day in question he arose about six o'clock in the morning, and, after a quarrel with his wife, obtained money from her and went out and drank until he became intoxicated. A friend and associate of the parties visited their rooms about eleven o'clock in the forenoon of July 4th, and left soon after. While there he witnessed a quarrel between Loppy and his wife, in which Loppy called her abusive names and threatened her life. The next that is learned about Loppy was from the same friend, who visited the defendant's rooms about three o'clock of the same day, when he found the door locked. He repeatedly knocked at the door, and finally, after much delay, obtained an entrance. The defendant came to the door, and, after inquiring who was there, opened it and let Weir into the room. Weir then beheld the dead body of the deceased, fully dressed, lying on the floor of the sitting-room. The floor of the room was covered with oil cloth, and near the body considerable pools of blood appeared to have been formed and wiped up with a wet cloth. The defendant had no clothes on but his pantaloons, shirt, underclothing and socks. His hands, stockings and shirt were spattered and stained with blood, and he had the appearance of being intoxicated. Upon inquiry, he replied that his wife had killed herself with the scissors. Weir then charged him with having killed her himself, but he said no, she killed herself. Weir then left and went down into the street, where he remained until he was called back into the room, some half an hour later. After Weir left, the defendant went out into the the hall and called the inmates of the other rooms of the house, saying: "Come up stairs, my wife is dead." After some of the people gathered in his room, he repeatedly said that " she had killed herself with the scissors." Some one

suggested calling the police, to which the defendant re-
plied: "This is a case for the coroner." One of the first
visitors to the room found near the body the half of a pair
of scissors, covered with blood, and he picked it up. The
defendant immediately took it and held it behind him.
Upon being asked by another bystander what he had in his
hand, he replied "Nothing." After he had been left alone
in the room for a short time, the police arrived, and he said:
"My wife has committed suicide." On being asked "What
with," he replied, "A pair of scissors." He was then asked,
"Where they were," and answered. "I don't know where
they are."

On search being made, one-half of a broken pair of scis-
sors, covered with blood, was found under the oil cloth
covering the floor, and the other half in the bedroom under
a basket. There was also found in the bedroom a pail con-
taining bloody water and a bloody towel. There were
found four wounds on the body ; all, apparently, made with
the same instrument; three upon the outside of the left
arm and one into the heart, on the left side of the body.
The blow entering the heart, evidently first pierced the
fleshy part of the arm about half way between the elbow
and the shoulder and then entered the body and reached
the heart. At the time the fatal blow was struck the left
arm had obviously been drawn up so as to cover the region
of the heart and interposed to guard against an anticipated
blow. Upon the trial the defendant testified that he left
the house, and his wife alive, just before two o'clock and
returned about ten minutes past three and found her dead,
lying on the floor ; that Weir was the first person who called
at his room after he returned and got there about fifteen
minutes past three; that after Weir left he went into the
hall and called the inmates of the other rooms and informed
them that his wife was dead, and that about four o'clock he
was arrested and taken to the police station.

Each floor of the house was occupied with tenants who

had opportunities of seeing those who passed out and in the house, but none of them saw the defendant go out or come in at the time he claimed to have done so. It was his habit to remain in the house during the day, and some of the witnesses testified that on the day in question Loppy and his wife were almost constantly engaged in quarrelling from the time they arose in the morning until two o'clock in the afternoon. The medical evidence showed that death must have occurred about two o'clock. In the face of this evidence it seems impossible to resist the conclusion that Mrs. Loppy was murdered and that her husband caused her death. He never suggested that the crime was committed in his absence during the commotion which immediately followed it; but constantly asserted that she killed herself with scissors, implying that he was present and knew it as a fact.

The nature and character of the wounds found on her arm and body are inconsistent with the idea that she inflicted them herself. A person attempting to kill herself would hardly have tried to protect the vital parts by holding her arm over them and thus interposing additional obstacles to the accomplishment of her purpose. That position would be instinctively adopted by one desiring to protect herself from assault and save, instead of taking her life. It could hardly have been possible that Loppy should have been absent from the room while the crime was committed. He claims that he was in the street from two to three o'clock; but no one saw him pass out or in the house and no one is called who saw him in the street or away from the house during this time. The condition of his clothing tended to show that he had not recently left the room and he was found, immediately after he pretends to have returned, with his hands and clothing stained and spattered with blood and having, obviously, been interrupted in an effort to remove the evidence of his crime. He evidently concealed the scissors with which the crime was effected, and, although constantly asserting that she killed herself with scissors, denied

all knowledge as to where they were or what had become of them.

Sufficient has been related of the circumstances of this crime to show that the jury were not only justified in their verdict, but were compelled to the conclusion which it indicated.

We are therefore of the opinion that the ends of justice require us to approve the verdict of the jury, and affirm the judgment appealed from.

All concur, except FINCH, J., absent.